## WILLIAMS ET AL. *v.* RHODES, GOVERNOR OF OHIO, ET AL.

No. 543.   Argued October 7, 1968.—Decided October 15, 1968.*

---

*Together with No. 544, *Socialist Labor Party et al.* v. *Rhodes, Governor of Ohio, et al.,* also on appeal from the same court.

*David J. Young* argued the cause and filed briefs for appellants in No. 543. *Jerry Gordon* argued the cause, *pro hac vice,* and filed briefs for appellants in No. 544.

*Charles S. Lopeman* argued the cause for appellees in both cases. With him on the briefs was *William B. Saxbe,* Attorney General of Ohio.

MR. JUSTICE BLACK delivered the opinion of the Court.

The State of Ohio in a series of election laws has made it virtually impossible for a new political party, even though it has hundreds of thousands of members, or an old party, which has a very small number of members, to be placed on the state ballot to choose electors pledged to particular candidates for the Presidency and Vice Presidency of the United States.

Ohio Revised Code, § 3517.01, requires a new party to obtain petitions signed by qualified electors totaling 15%

of the number of ballots cast in the last preceding guber-
natorial election. The detailed provisions of other Ohio
election laws result in the imposition of substantial addi-
tional burdens, which were accurately summarized in
Judge Kinneary's dissenting opinion in the court below
and were substantially agreed on by the other members
of that court.[1] Together these various restrictive pro-
visions make it virtually impossible for any party to
qualify on the ballot except the Republican and Demo-
cratic Parties. These two Parties face substantially
smaller burdens because they are allowed to retain their

---

[1] Judge Kinneary describes, in his dissenting opinion below, the
legal obstacles placed before a would-be third party even after the
15% signature requirement has been fulfilled:

"*First,* at the primary election, the new party, or any political party,
is required to elect a state central committee consisting of two
members from each congressional district and county central com-
mittees for each county in Ohio. [Ohio Rev. Code §§ 3517.02–
3517.04.] *Second,* at the primary election the new party must
elect delegates and alternates to a national convention. [Ohio Rev.
Code § 3505.10.] Since Section 3513.19.1, Ohio Rev. Code, pro-
hibits a candidate from seeking the office of delegate to the national
convention or committeeman if he voted as a member of a different
party at a primary election in the preceding four year period, the
new party would be required to have over twelve hundred members
who had not previously voted in another party's primary, and who
would be willing to serve as committeemen and delegates. *Third,*
the candidates for nomination in the primary would have to file
petitions signed by qualified electors. [Ohio Rev. Code § 3513.05.]
The term 'qualified electors' is not adequately defined in the Ohio
Revised Code [§ 3501.01 (H)], but a related section [§ 3513.19],
provides that a qualified elector at a primary election of a political
party is one who, (1) voted for a majority of that party's candidates
at the last election, or, (2) has never voted in any election before.
Since neither of the political party plaintiffs had any candidates
at the last preceding regular state election, they would, of necessity,
have to seek out members who had never voted before to sign the
nominating petitions, and it would be only these persons who could
vote in the primary election of the new party."

positions on the ballot simply by obtaining 10% of the votes in the last gubernatorial election and need not obtain any signature petitions. Moreover, Ohio laws make no provision for ballot position for independent candidates as distinguished from political parties. The State of Ohio claims the power to keep minority parties and independent candidates off the ballot under Art. II, § 1, of the Constitution, which provides that:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ."

The Ohio American Independent Party, an appellant in No. 543, and the Socialist Labor Party, an appellant in No. 544, both brought suit to challenge the validity of these Ohio laws as applied to them, on the ground that they deny these Parties and the voters who might wish to vote for them the equal protection of the laws, guaranteed against state abridgment by the Equal Protection Clause of the Fourteenth Amendment. The three-judge District Court designated to try the case ruled these restrictive Ohio election laws unconstitutional but refused to grant the Parties the full relief they had sought, 290 F. Supp. 983 (D. C. S. D. Ohio 1968), and both Parties have appealed to this Court. The cases arose in this way:

The Ohio American Independent Party was formed in January 1968 by Ohio partisans of former Governor George C. Wallace of Alabama. During the following six months a campaign was conducted for obtaining signatures on petitions to give the Party a place on the ballot and over 450,000 signatures were eventually obtained, more than the 433,100 required. The State contends and the Independent Party agrees that due to the interaction of several provisions of the Ohio laws, such petitions were required to be filed by February 7, 1968,

and so the Secretary of the State of Ohio informed the Party that it would not be given a place on the ballot. Neither in the pleadings, the affidavits before the District Court, the arguments there, nor in our Court has the State denied that the petitions were signed by enough qualified electors of Ohio to meet the 15% requirement under Ohio law. Having demonstrated its numerical strength, the Independent Party argued that this and the other burdens, including the early deadline for filing petitions and the requirement of a primary election conforming to detailed and rigorous standards, denied the Party and certain Ohio voters equal protection of the laws. The three-judge District Court unanimously agreed with this contention and ruled that the State must be required to provide a space for write-in votes. A majority of the District Court refused to hold, however, that the Party's name must be printed on the ballot, on the ground that Wallace and his adherents had been guilty of "laches" by filing their suit too late to allow the Ohio Legislature an opportunity to remedy, in time for the presidential balloting, the defects which the District Court held the law possessed. The appellants in No. 543 then moved before MR. JUSTICE STEWART, Circuit Justice for the Sixth Circuit, for an injunction which would order the Party's candidates to be put on the ballot pending appeal. After consulting with the other members of the Court who were available, and after the State represented that the grant of interlocutory relief would be in the interests of the efficient operation of the electoral machinery if this Court considered the chances of successful challenge to the Ohio statutes good, MR. JUSTICE STEWART granted the injunction.

The Socialist Labor Party, an appellant in No. 544, has all the formal attributes of a regular party. It has conventions and a State Executive Committee as required by the Ohio law, and it was permitted to have a place on

the ballot until 1948. Since then, however, it has not filed petitions with the total signatures required under new Ohio laws for ballot position, and indeed it conceded it could not do so this year. The same three-judge panel heard the Party's suit and reached a similar result—write-in space was ordered but ballot position was denied the Socialist Labor Party. In this case the District Court assigned both the Party's small membership of 108 and its delay in bringing suit as reasons for refusing to order more complete relief for the 1968 election. A motion to stay the District Court's judgment was presented to Mr. Justice Stewart several days after he had ordered similar relief in the Independent Party case. The motion was denied principally because of the Socialist Party's failure to move quickly to obtain relief, with the consequent confusion that would be caused by requiring Ohio once again to begin completely reprinting its election ballots, but the case was set by this Court for oral argument, along with the Independent Party case.

## I.

Ohio's claim that the political-question doctrine precludes judicial consideration of these cases requires very little discussion. That claim has been rejected in cases of this kind numerous times. It was rejected by the Court unanimously in 1892 in the case of *McPherson v. Blacker,* 146 U. S. 1, 23–24, and more recently it has been squarely rejected in *Baker* v. *Carr,* 369 U. S. 186, 208–237 (1962), and in *Wesberry* v. *Sanders,* 376 U. S. 1, 5–7 (1964). Other cases to the same effect need not now be cited. These cases do raise a justiciable controversy under the Constitution and cannot be relegated to the political arena.

## II.

The State also contends that it has absolute power to put any burdens it pleases on the selection of electors

because of the First Section of the Second Article of the Constitution, providing that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . ." to choose a President and Vice President. There, of course, can be no question but that this section does grant extensive power to the States to pass laws regulating the selection of electors. But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution. For example, Congress is granted broad power to "lay and collect Taxes," [2] but the taxing power, broad as it is, may not be invoked in such a way as to violate the privilege against self-incrimination.[3] Nor can it be thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws. Clearly, the Fifteenth and Nineteenth Amendments were intended to bar the Federal Government and the States from denying the right to vote on grounds of race and sex in presidential elections. And the Twenty-fourth Amendment clearly and literally bars any State from imposing a poll tax on the right to vote "for electors for President or Vice President." Obviously we must reject the notion that Art. II, § 1, gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions. We therefore hold that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that "No State shall . . . deny to any person . . . the equal protection of the laws."

---

[2] Art. I, § 8, cl. 1.

[3] *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968).

### III.

We turn then to the question whether the court below properly held that the Ohio laws before us result in a denial of equal protection of the laws. It is true that this Court has firmly established the principle that the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution. But we have also held many times that "invidious" distinctions cannot be enacted without a violation of the Equal Protection Clause.[4] In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.[5] In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment.[6] And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same

---

[4] *Skinner* v. *Oklahoma,* 316 U. S. 535, 539–541 (1942); *Cox* v. *Louisiana,* 379 U. S. 536, 557 (1965); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Brown* v. *Board of Education,* 347 U. S. 483 (1954); *Loving* v. *Virginia,* 388 U. S. 1 (1967).

[5] See, *e. g., Carrington* v. *Rash,* 380 U. S. 89 (1965); *Skinner* v. *Oklahoma, supra.*

[6] *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217 (1967); *NAACP* v. *Button,* 371 U. S. 415 (1963); *NAACP* v. *Alabama,* 357 U. S. 449 (1958).

protection from infringement by the States.[7]  Similarly we have said with reference to the right to vote: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined." [8]

No extended discussion is required to establish that the Ohio laws before us give the two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate.  The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes.  So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.  In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP v. Button,* 371 U. S. 415, 438 (1963).

The State has here failed to show any "compelling interest" which justifies imposing such heavy burdens on the right to vote and to associate.

The State asserts that the following interests are served by the restrictions it imposes.  It claims that the State may validly promote a two-party system in order to en-

---

[7] See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 276–277 (1964), and cases there cited.

[8] *Wesberry* v. *Sanders, supra,* at 17.  See also *Carrington* v. *Rash, supra.*

courage compromise and political stability. The fact is, however, that the Ohio system does not merely favor a "two-party system"; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

Ohio makes a variety of other arguments to support its very restrictive election laws. It points out, for example, that if three or more parties are on the ballot, it is possible that no one party would obtain 50% of the vote, and the runner-up might have been preferred to the plurality winner by a majority of the voters. Concededly, the State does have an interest in attempting to see that the election winner be the choice of a majority of its voters. But to grant the State power to keep all political parties off the ballot until they have enough members to win would stifle the growth of all new parties working to increase their strength from year to year. Considering these Ohio laws in their totality, this interest cannot justify the very severe restrictions on voting and associational rights which Ohio has imposed.

The State also argues that its requirement of a party structure and an organized primary insures that those who disagree with the major parties and their policies "will be given a choice of leadership as well as issues" since any leader who attempts to capitalize on the disaffection of such a group is forced to submit

to a primary in which other, possibly more attractive, leaders can raise the same issues and compete for the allegiance of the disaffected group. But while this goal may be desirable, Ohio's system cannot achieve it. Since the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected "group" will rarely if ever be a cohesive or identifiable group until a few months before the election. Thus, Ohio's burdensome procedures, requiring extensive organization and other election activities by a very early date, operate to prevent such a group from ever getting on the ballot and the Ohio system thus denies the "disaffected" not only a choice of leadership but a choice on the issues as well.

Finally Ohio claims that its highly restrictive provisions are justified because without them a large number of parties might qualify for the ballot, and the voters would then be confronted with a choice so confusing that the popular will could be frustrated. But the experience of many States, including that of Ohio prior to 1948, demonstrates that no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required.[9] It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but in Ohio at the present time this danger seems to us no more than "theoretically imaginable." [10] No such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case.

---

[9] Forty-two States require third parties to obtain the signatures of only 1% or less of the electorate in order to appear on the ballot. It appears that no significant problem has arisen in these States which have relatively lenient requirements for obtaining ballot position.

[10] Cf. *Mine Workers* v. *Illinois Bar Assn., supra,* at 224.

Of course, the number of voters in favor of a party, along with other circumstances, is relevant in considering whether state laws violate the Equal Protection Clause. And, as we have said, the State is left with broad powers to regulate voting, which may include laws relating to the qualification and functions of electors. But here the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause.

## IV.

This leaves only the propriety of the judgments of the District Court. That court held that the Socialist Labor Party could get relief to the extent of having the right, despite Ohio laws, to get the advantage of write-in ballots. It restricted the Independent Party to the same relief. The Independent Party went before the District Court, made its challenge, and prayed for broader relief, including a judgment declaring the Ohio laws invalid. It also asked that its name be put on the ballot along with the Democratic and Republican Parties. The Socialist Labor Party also went to the District Court and asked for the same relief. On this record, however, the parties stand in different positions before us. Immediately after the District Court entered its judgment, the new Independent Party brought its case to this Court where MR. JUSTICE STEWART conducted a hearing. At that hearing Ohio represented to MR. JUSTICE STEWART that the Independent Party's name could be placed on the ballot without out disrupting the state election, but if there was a long delay, the situation would be different. It was not until several days after that hearing was concluded and after MR. JUSTICE STEWART had issued his order staying the judgment against the Independent Party that the Socialist Labor Party asked for similar relief. The State

objected on the ground that at that time it was impossible to grant the relief to the Socialist Labor Party without disrupting the process of its elections; accordingly MR. JUSTICE STEWART denied it relief, and the State now repeats its statement that relief cannot be granted without serious disruption of election process. Certainly at this late date it would be extremely difficult, if not impossible, for Ohio to provide still another set of ballots. Moreover, the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens, for example, absentee voters. Under the circumstances we require Ohio to permit the Independent Party to remain on the ballot, along with its candidates for President and Vice President, subject, of course, to compliance with valid regulatory laws of Ohio, including the law relating to the qualification and functions of electors. We do not require Ohio to place the Socialist Party on the ballot for this election. The District Court's judgment is affirmed with reference to No. 544, the Socialist Labor Party case, but is modified in No. 543, the Independent Party case, with reference to granting that Party the right to have its name printed on the ballot.

*It is so ordered.*

MR. JUSTICE STEWART concurs in the judgment in No. 544 insofar as it denies equitable relief to the appellants.

MR. JUSTICE DOUGLAS.

I.

Ohio, through an entangling web of election laws, has effectively foreclosed its presidential ballot to all but Republicans and Democrats. It has done so initially by abolishing write-in votes so as to restrict candidacy

to names on the ballot; [1] it has eliminated all independent candidates through a requirement that nominees enjoy the endorsement of a political party; [2] it has defined "political party" in such a way as to exclude virtually all but the two major parties.[3]

A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election. In this election year, 1968, a candidate would need 433,100 such signatures. Moreover, he must succeed in gathering them long before the general election, since a nominating petition must be filed with the Secretary of State in February.[4] That is not all: having compiled those signatures, the candidate must further show that he has received the nomination of a group which qualifies as a "political party" within the meaning of Ohio law.[5] It is not enough to be an independent candidate for President with wide popular support; one must trace his support to a political party.[6]

To qualify as a party, a group of electors must participate in the state primary, electing one of its members from each county ward or precinct to a county central committee; two of its members from each congressional district to a state central committee; [7] and some of its members as delegates and alternates to a na-

---

[1] Ohio Rev. Code § 3505.03 (1960 Repl. Vol.).

[2] Independent candidacy in Ohio is limited to municipal offices, Ohio Rev. Code §§ 3513.251–3513.252; county offices, Ohio Rev. Code § 3513.256; state offices, and federal offices excluding President, Ohio Rev. Code §§ 3513.257–3513.258.

[3] Ohio Rev. Code §§ 3505.10, 3513.05–3513.191, 3517.01–3517.04.

[4] A candidate for President must first formulate a party by gathering signatures, Ohio Rev. Code § 3517.01, which must, in turn, be presented in time for the party to participate in the state primary. Ohio Rev. Code §§ 3513.256–3513.262.

[5] Ohio Rev. Code § 3513.258.

[6] Ohio Rev. Code § 3505.10.

[7] Ohio Rev. Code § 3517.02–3517.04.

tional convention.[8]   Moreover, those of its members who seek a place on the primary ballot as candidates for positions as central committeemen and national convention delegates must demonstrate that they did not vote in any other party primary during the preceding four years;[9] and must present petitions of endorsement on their behalf by anywhere from five to 1,000 voters who likewise failed to vote for any other party in the last preceding primary.[10]   Thus, to qualify as a third party, a group must first erect elaborate political machinery, and then rest it upon the ranks of those who have proved both unwilling and unable to vote.

Having elected a central committee, the group has it convene a state convention attended by 500 delegates duly apportioned throughout the State according to party strength.[11]   Delegates to the state convention then go on to choose presidential electors for certification on the November ballot, while elected delegates to the national convention go on to nominate their candidate for President.[12]   Ohioans, to be sure, as a result of the decision below, enjoy the opportunity of writing in the man of their choice on the ballot.   But in a presidential election, a vote for a candidate is only operative as a vote for the electors representing him; and where the State has prevented that candidate from presenting a slate of electors for certification, the write-in vote has no effect.   Furthermore, even where operative, the write-ins are no substitute for a place on the ballot.

To force a candidate to rely on write-ins is to burden him with disability.   It makes it more difficult for him to get elected, and for the voters to elect him.

---

[8] Ohio Rev. Code § 3505.10.

[9] Ohio Rev. Code § 3513.191.

[10] Ohio Rev. Code § 3513.05.

[11] Ohio Rev. Code § 3513.11.

[12] Ohio Rev. Code § 3513.12.

These barriers of party, timing, and structure are great obstacles. Taken together they render it difficult, if not impossible, for a man who disagrees with the two major parties to run for President in Ohio, to organize an opposition, and to vote a third ticket.

## II.

The selection of presidential electors is provided in Art. II, § 1, of the Constitution. It is unnecessary in this case to decide whether electors are state rather than federal officials, whether States may select them through appointment rather than by popular vote, or whether there is a constitutional right to vote for them. For in this case Ohio has already provided for them to be chosen by right of popular suffrage. Having done so, the question is whether Ohio may encumber that right with conditions of the character imposed here.

## III.

The First Amendment, made applicable to the States by reason of the Fourteenth Amendment, lies at the root of these cases. The right of association is one form of "orderly group activity" (*NAACP* v. *Button,* 371 U. S. 415, 430), protected by the First Amendment. The right "to engage in association for the advancement of beliefs and ideas" (*NAACP* v. *Alabama,* 357 U. S. 449, 460), is one activity of that nature that has First Amendment protection. As we said in *Bates* v. *Little Rock,* 361 U. S. 516, 523, "freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States." And see *Louisiana* v. *NAACP,* 366 U. S. 293, 296. At the root of the present controversy is the right tó vote—a "fundamental political right" that is "preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370. The rights of expression

and assembly may be "illusory if the right to vote is undermined." *Wesberry* v. *Sanders,* 376 U. S. 1, 17.

In our political life, third parties are often important channels through which political dissent is aired: "All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, which innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . . The absence of such voices would be a symptom of grave illness in our society." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250–251 (opinion of WARREN, C. J.).

The Equal Protection Clause of the Fourteenth Amendment permits the States to make classifications and does not require them to treat different groups uniformly. Nevertheless, it bans any "invidious discrimination." *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 667.

That command protects voting rights and political groups (*Carrington* v. *Rash,* 380 U. S. 89), as well as economic units, racial communities, and other entities. When "fundamental rights and liberties" are at issue (*Harper* v. *Virginia Board, supra,* at 670), a State has less leeway in making classifications than when it deals with economic matters. I would think that a State has precious little leeway in making it difficult or impossible for citizens to vote for whomsoever they please and to organize campaigns for any school of thought they may choose, whatever part of the spectrum it reflects.

Cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote. The totality of Ohio's requirements has those effects. It is unnecessary to decide whether Ohio has an interest, "compelling" or not, in abridging those

rights, because "the men who drafted our Bill of Rights did all the 'balancing' that was to be done in this field." *Konigsberg* v. *State Bar,* 366 U. S. 36, 61 (BLACK, J., dissenting). Appellees would imply that "no kind of speech is to be protected if the Government can assert an interest of sufficient weight to induce this Court to uphold its abridgment." (*Id.,* at 67.) I reject that suggestion.[13]

A three-judge district court held that appellants were entitled to the use of write-in ballots. Yet it refrained from ordering the Ohio American Independent Party to be placed on the ballot, relying partly on laches and partly on the presence of what it deemed to be so-called "political" questions. 290 F. Supp. 983. First Amendment rights, the right to vote, and other "fundamental rights and liberties" (*Harper* v. *Virginia Board, supra,* at 670) have a well-established claim to inclusion in justiciable, as distinguished from "political," questions; and the relief the Court grants meets the practical needs of appellees in preparing and distributing the ballots.

The Socialist Labor Party, with a lineage that goes back to the presidential contest in 1892, by 1964 was on the ballot in 16 States. Today, although it has only 108 members in Ohio, it earnestly presses its claim for recognition. Yet it started the present action so late that concededly it would now be impossible to get its name on all the ballots. The relief asked is of such a character that we properly decline to allow the federal courts to play a disruptive role in this 1968 state election. On the merits, however, the Socialist Labor Party has as strong a case as the American Independent Party, as my Brother HARLAN states and as the Court apparently

---

[13] *Bates* v. *City of Little Rock,* 361 U. S. 516, 528 (BLACK and DOUGLAS, JJ., concurring); *Smith* v. *California,* 361 U. S. 147, 157 (BLACK, J., concurring).

agrees. It is therefore proper for us to grant it declaratory relief.

Hence I concur in today's decision; and, while my emphasis is different from the Court's, I join its opinion.

MR. JUSTICE HARLAN, concurring in the result.

I agree that the American Independent Party is entitled to have the names of its Presidential and Vice Presidential candidates placed on the Ohio ballot in the forthcoming election, but that, for the practical reasons stated by the Court, the Socialist Labor Party is not. However, I would rest this decision entirely on the proposition that Ohio's statutory scheme violates the basic right of political association assured by the First Amendment which is protected against state infringement under the Due Process Clause of the Fourteenth Amendment. See *NAACP* v. *Button,* 371 U. S. 415 (1963); *Bates* v. *Little Rock,* 361 U. S. 516 (1960); *NAACP* v. *Alabama,* 357 U. S. 449 (1958). It is true that Ohio has not directly limited appellants' right to assemble or discuss public issues or solicit new members. Compare *Thomas* v. *Collins,* 323 U. S. 516 (1945); *De Jonge* v. *Oregon,* 299 U. S. 353 (1937); *Near* v. *Minnesota,* 283 U. S. 697 (1931). Instead, by denying the appellants any opportunity to participate in the procedure by which the President is selected, the State has eliminated the basic incentive that all political parties have for conducting such activities, thereby depriving appellants of much of the substance, if not the form, of their protected rights. The right to have one's voice heard and one's views considered by the appropriate governmental authority is at the core of the right of political association.

It follows that the particular method by which Presidential Electors are chosen is not of decisive importance

to a solution of the constitutional problem before us. Just as a political group has a right to organize effectively so that its position may be heard in court, *NAACP* v. *Button, supra,* or in the legislature, cf. *Eastern R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 137–138 (1961); *United States* v. *Rumely,* 345 U. S. 41, 46–47 (1953); *United States* v. *Harriss,* 347 U. S. 612, 625–626 (1954); so it has the right to place its candidate for the Presidency before whatever body has the power to make the State's selection of Electors. Consequently, it makes no difference that the State of Ohio may, under the Second Article of the Constitution, place the power of Electoral selection beyond the control of the general electorate. The requirement imposed by the Due Process Clause remains the same—no matter what the institution to which the decision is entrusted, political groups have a right to be heard before it. A statute that would require that all Electors be members of the two major parties is subject to the same constitutional challenge regardless of whether it is the legislature, the people, or some other body that is empowered to make the ultimate decision under the laws of the State.

Of course, the State may limit the right of political association by invoking an impelling policy justification for doing so. But as my Brother BLACK's opinion demonstrates, Ohio has been able to advance no such justification for denying almost half a million of its citizens their fundamental right to organize effectively for political purposes. Consequently, it may not exclude them from the process by which Presidential Electors are selected.

In deciding this case of first impression, I think it unnecessary to. draw upon the Equal Protection Clause.[1]

---

[1] The fact that appellants have chosen to pitch their argument throughout on the Equal Protection Clause does not, of course, limit us in reaching our decision here.

I am by no means clear that equal protection doctrine, especially as it has been propounded in the recent state reapportionment cases, e. g., *Reynolds* v. *Sims*, 377 U. S. 533 (1964), may properly be applied to adjudicate disputes involving the mere procedure by which the President is selected, as that process is governed by profoundly different principles.[2] Despite my doubts on this score, I think it perfectly consistent and appropriate to hold the Due Process Clause applicable. For I believe that our task is more difficult than one which involves merely the mechanical application of the commands to be found in the Fourteenth Amendment or in the first section of the Second Article to the Constitution. Rather, we must attempt to accommodate as best we may the narrow provision drafted by the Philadelphia Convention with the broad principles announced in the Fourteenth Amendment, generations later.

A decision resting solely upon the Due Process Clause would permit such an accommodation—for such a holding fully respects the original purposes and early development of the Electoral College. When one looks beyond the language of Article II, and considers the Convention's understanding of the College, Ohio's restrictive approach is seen to undermine what the draftsmen understood to be its very essence. The College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to preclude an informed choice

---

[2] At no stage in the complex process by which a President is chosen is the "one man, one vote" principle of *Reynolds* v. *Sims* followed. The constitutional decision to grant each State at least three Electors, regardless of population, was a necessary part of the effort to gain the consent of the small States, as was the provision that when the choice of the President fell to the House, each state delegation would cast but one vote. See N. Peirce, The People's President 43–50 (1968); L. Wilmerding, The Electoral College 17–22 (1958).

by the citizenry at large.[3]   If a State declares that an entire class of citizens is ineligible for the position of Elector, and that class is defined in a way in which individual merit plays no part, it strikes at the very basis of the College as it was originally conceived.

The constitutional grant of power to the States was intended for a different purpose.   While Madison reports that the popular election of Electors on a district-by-district basis was the method "mostly, if not exclusively, in view when the Constitution was framed and adopted," 3 M. Farrand, The Records of the Federal Convention of 1787, p. 459 (1911), it is quite clear that a significant, if not dominant, group[4] at the Convention contemplated that Electors would be chosen by other methods.   It was to accommodate these members that the state legislatures were given their present leeway.[5]   While during the first four decades of the Republic, the States did in fact adopt a variety of methods for selecting their Electors,[6] the parties in this case

---

[3] Federalist Papers, No. 68 (Alexander Hamilton) (H. Lodge ed. 1908) ; American Bar Association, Electing The President 15 (1967) ; Wilmerding, *supra,* n. 2, at 10; R. MacBride, The American Electoral College 16–17 (1953).

[4] The large number of leaders, of varying ideological convictions, who favored popular election included Hamilton, Madison, James Wilson, John Dickinson, Rufus King, Daniel Carroll, and Abraham Baldwin. The opponents of popular selection included Gerry, Ellsworth, Luther Martin, and Roger Sherman. See Chief Justice Fuller's illuminating opinion in *McPherson* v. *Blacker,* 146 U. S. 1, 28 (1892). See also Wilmerding, *supra,* n. 2, at 13–14.

[5] The story of the compromise is to be found in Wilmerding, *supra,* n. 2, at 17–22. The Convention did not, however, direct its attention to the precise meaning of the clause that is the subject of consideration here. See Peirce, *supra,* n. 2, at 45.

[6] Electors were chosen by the legislature itself, by the general electorate on an at-large and district-by-district basis, partly by the legislature and partly by the people, by the legislature from a list of candidates selected by the people, and in other ways. See *McPherson* v. *Blacker, supra,* 28–33; Wilmerding, *supra,* n. 2, c. 3; Peirce, *supra,* n. 2, at 309.

have pointed to, and I have found, no case in which the legislature attempted by statute to restrict the class of the enfranchised citizenry that could be considered for the office by whatever body was to make the choice.[7]

Nothing in the history of the Electoral College from the moment of its inception, then, indicates that the original understanding of that institution would at all be compromised if we refuse to read the language of Art. II, § 1, as granting a power of arbitrary action which is so radically inconsistent with the general principles of the Due Process Clause. Consequently, there is no obstacle to a holding which denies the States, absent an overriding state interest, the right to prevent third parties from having an opportunity to put their candidates before the attention of the voters or whatever other body the State has designated as the one which is to choose Electors.

A word should be added about the constitutional status of Ohio's requirement that a third party, to qualify for ballot position, must collect the signatures of eligible voters in a number equal to 15% of those voting at the last gubernatorial election. As I do not understand the State to contest the fact that Mr. Wallace and his partisans have successfully gathered more than the 433,100 signatures required by law, we can only properly reach this issue in the *Socialist Labor Party* case—for this Party did not even attempt to comply with the

---

[7] Nor does the leading case in this area, *McPherson* v. *Blacker, supra,* support such a claim. There the plaintiffs-in-error had challenged Michigan's attempt to permit its voters to select Electors on a district-by-district, rather than an at-large, basis. The Court held that, given the early history, see n. 6, *supra,* the States have the plenary power to alter the method by which Electors are selected so long as the method cannot be attacked on Fourteenth Amendment grounds. Pursuing this analysis, the unanimous Court found the district-by-district approach free of any Fourteenth Amendment defect, 146 U. S., at 37–40. I can perceive no reason to doubt the continuing validity of this holding.

statutory command. While the Court's opinion, striking down Ohio's statutory scheme in its entirety, does, as I read it, afford the Socialist Labor Party declaratory relief from the 15% provision, I think it well to deal with it more explicitly than the Court has done.

In my view, this requirement, even when regarded in isolation, must fall. As my Brother BLACK's opinion suggests, the only legitimate interest the State may invoke in defense of this barrier to third-party candidacies is the fear that, without such a barrier, candidacies will proliferate in such numbers as to create a substantial risk of voter confusion.[8] Ohio's requirement cannot be said to be reasonably related to this interest. Even in the unprecedented event of a complete and utter popular disaffection with the two established parties, Ohio law would permit as many as six additional party candidates to compete with the Democrats and Republicans only if popular support should be divided relatively evenly among the

---

[8] My Brother STEWART is, of course, quite right in pointing out that the presence of third parties may on occasion result in the election of the major candidate who is in reality less preferred by the majority of the voters. It seems clear to me, however, that many constitutional electoral structures could be designed which would accommodate this valid state interest, without depriving other political organizations of the right to participate effectively in the political process. A runoff election may be mandated if no party gains a majority, or the decision could be left to the State Legislature in such a case, compare *Fortson* v. *Morris*, 385 U. S. 231 (1966). Alternatively, the voter could be given the right, at the general election, to indicate both his first and his second choice for the Presidency—if no candidate received a majority of first-choice votes, the second-choice votes could then be considered. Finally, Electors could be chosen on a district-by-district rather than an at-large basis, thereby apportioning the electoral vote in a way more nearly approximating the popular vote. See *McPherson* v. *Blacker, supra,* and text, at n. 4, *supra.* I would conclude that, with the substantial variety of less restrictive alternatives that are available, compare *NAACP* v. *Alabama,* 377 U. S. 288, 307–308 (1964); *Saia* v. *New York,* 334 U. S. 558, 562 (1948); *Martin* v. *Struthers,* 319 U. S.

new groups.  And with fundamental freedoms at stake, such an unlikely hypothesis cannot support an incursion upon protected rights, especially since the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion.  As both Ohio's electoral history[9] and the actions taken by the overwhelming majority of other States[10] suggest, opening the ballot to this extent is perfectly consistent with the effective functioning of the electoral process.  In sum, I think that Ohio has fallen far short of showing the compelling state interest necessary to overcome this otherwise protected right of political association.

---

141, 146–149 (1943); *Thornhill* v. *Alabama,* 310 U. S. 88, 96 (1940); *Schneider* v. *State,* 308 U. S. 147 (1939), this interest cannot support Ohio's 15% requirement.

[9] Ohio's present statutory scheme is a product of legislative action taken between 1948 and 1952.  Before that time, independent candidates had been granted a place on the ballot if they could gather the signatures of registered voters in the number of 1% of those voting at the preceding gubernatorial election and present their petitions 60 days before the general election.  The State's experience under this unexacting regime is instructive.  Voting statistics compiled by Ohio's Secretary of State reveal that since 1900 no more than seven parties have appeared on the ballot to compete for a major statewide or national office.  And even this number was not attained after 1908.  During the last 10 years of the old regime, there are only two third-party candidates of record.  The State took effective action only after Electors pledged to Henry A. Wallace gained some 30,000 votes out of the 3,000,000 cast in 1948.  Since Harry S Truman carried the State by some 7,000 votes, the Wallace vote might well have been decisive if it had increased marginally.

[10] The other 49 States may be grouped in the following categories with regard to the size of the barriers they raise against third-party candidacies:

| Signatures Required as a % of Electorate | No. of States |
|---|---|
| De minimis to 0.1% | 16 |
| 0.1% to 1% | 26 |
| 1.1% to 3% | 3 |
| 3.1% to 5% | 4 |

Since Ohio's requirement is so clearly disproportionate to the magnitude of the risk that it may properly act to prevent, I need not reach the question of the size of the signature barrier a State may legitimately raise against third parties on this ground. This should be left to the Ohio Legislature in the first instance.

MR. JUSTICE STEWART, dissenting in No. 543.*

If it were the function of this Court to impose upon the States our own ideas of wise policy, I might be inclined to join my Brethren in compelling the Ohio election authorities to disregard the laws enacted by the legislature of that State. We deal, however, not with a question of policy, but with a problem of constitutional power. And to me it is clear that, under the Constitution as it is written, the Ohio Legislature has the power to do what it has done.

## I.

The Constitution does not provide for popular election of a President or Vice President of the United States, either nationally or on a state-by-state basis. On the contrary, the Constitution explicitly specifies:

> "Each State shall *appoint, in such Manner as the Legislature thereof may direct,* a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ."[1] (Emphasis supplied.)

---

[1] U. S. Const., Art. II, § 1. This provision represented a compromise among several conflicting views expressed at the Constitutional Convention regarding the most salutary method for choosing a President, most of which favored some method other than popular election. See *McPherson* v. *Blacker,* 146 U. S. 1, 28.

"The Electors shall meet in their respective states and vote by ballot for President and Vice-President . . . ." [2]

Chief Justice Fuller, therefore, was stating no more than the obvious when he wrote for a unanimous Court in *McPherson* v. *Blacker,* 146 U. S. 1, more than 75 years ago:

"The Constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.

.     .     .     .     .

"In short, the appointment and mode of appointment of electors belong exclusively to the States under the Constitution of the United States. . . ." *Id.,* at 27, 35.

A State is perfectly free under the Constitution to provide for the selection of its presidential electors by the legislature itself. Such a process of appointment was in fact utilized by several States throughout our early history, and by one State, Colorado, as late as 1876. [3]  Or a state legislature might nominate two slates of electors, and allow all eligible voters of the State to choose between them. Indeed, many of the States formerly provided for the appointment of presidential electors by

---

[2] U. S. Const., Amdt. 12. The Twelfth Amendment also specifies the procedures for selecting a President and Vice President in the event that no candidate receives a majority of votes in the electoral college.

[3] See *McPherson* v. *Blacker, supra,* at 35.

various kinds of just such cooperative action of their legislatures and their electorates.[4]

Here, the Ohio Legislature has gone further, and has provided for a choice by the State's eligible voters among slates of electors put forward by all political parties that meet the even-handed requirements of long-standing state laws. We are told today, however, that, despite the power explicitly granted to the state legislatures under Art. II, § 1, the Legislature of Ohio nonetheless violated the Constitution in providing for the selection of electors in this way. I can perceive no such constitutional violation.

I agree with my Brethren that, in spite of the broad language of Art. II, § 1, a state legislature is not completely unfettered in choosing whatever process it may wish for the appointment of electors. Three separate constitutional amendments explicitly limit a legislature's power. The Fifteenth Amendment makes clear that if voters are to be included in the process, no voter may be excluded "on account of race, color, or previous condition of servitude." The Nineteenth Amendment makes equally clear that no voter may be excluded "on account of sex." And the Twenty-fourth Amendment prohibits exclusion of any voter "by reason of failure to pay any poll tax or other tax." But no claim has been or could be made in this case that any one of these Amendments has been violated by Ohio.

---

[4] "[V]arious modes of choosing the electors were pursued, as, by the legislature itself on joint ballot; by the legislature through a concurrent vote of the two houses; by vote of the people for a general ticket; by vote of the people in districts; by choice partly by the people voting in districts and partly by the legislature; by choice by the legislature from candidates voted for by the people in districts; and in other ways . . . ." *McPherson* v. *Blacker, supra,* at 29.

For a fuller description of the diverse methods pursued by the States in appointing their electors under Art. II, § 1, during this Country's first century of constitutional experience, see *id.,* at 26–35.

Rather, it is said that Ohio has violated the provisions of the Fourteenth Amendment. The Court holds that the State has violated that Clause of the Amendment which prohibits it from denying "to any person within its jurisdiction the equal protection of the laws." And two concurring opinions emphasize First Amendment principles, made applicable to the States through the Fourteenth Amendment's guarantees, in summarily concluding that Ohio's statutory scheme is invalid. I concede that the Fourteenth Amendment imposes some limitations upon a state legislature's freedom to choose a method for the appointment of electors. A State may not, for example, adopt a system that discriminates on grounds of religious or political belief. But I cannot agree that Ohio's system violates the Fourteenth Amendment in any way.

## II.

In view of the broad leeway specifically given the States by Art. II, § 1, of the Constitution, it seems clear to me that the basic standard of constitutional adjudication under the Equal Protection Clause—a standard under which only "invidious discrimination" is forbidden—is the most stringent test that properly can be held applicable here. A single quotation should suffice to summarize that standard of equal protection:

> "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U. S. 420, 425–426.

The provisions enacted by the Ohio Legislature fully meet that standard.[5]

The laws of Ohio classify political parties, for purposes of access to that State's ballot, according to size and strength.[6] Those that timely demonstrate widespread support in the State may submit a slate of presidential electors to Ohio's voters, while those that neither have participated in past elections nor can show the support of 15% of the voting public 90 days before a primary election may not.[7] The appellants claim that these provisions discriminate against them. They assert that although Ohio may establish "reasonable" qualifying standards so that ballots do not become unwieldy, the

---

[5] It is clear that this Court's decisions in such cases as *Baker* v. *Carr*, 369 U. S. 186; *Gray* v. *Sanders*, 372 U. S. 368; and *Reynolds* v. *Sims*, 377 U. S. 533, all involving the direct popular election of candidates to state or federal office, do not control the issues in this case. Indeed, no opinion today suggests that those cases are apposite. They sustained the right of a voter to cast a ballot whose numerical weight is the equal of that of any other vote cast within the jurisdiction in question. No claim is made in this case that Ohio has in any way violated that right.

[6] The appellants plainly do not object to working through or voting for candidates of partisan political organizations, and I do not understand them to claim discrimination on the basis of Ohio's failure to allow access to its presidential ballot via an "independent nominating petition."

[7] Appellants have cited us to a complex group of Ohio statutes which they say are relevant to the participation of political parties in that State's presidential elections. See Ohio Rev. Code §§ 3505.10, 3513.05, 3513.11, 3513.19, 3513.191, 3517.01–3517.04. It is not entirely clear that all of those provisions are applicable to parties participating in the electoral process for the first time. But we need not examine that question since in any event the appellants clearly failed to file with the Secretary of State of Ohio on February 7 of this year, 90 days before the State's primary election, a petition signed by a number of voters equal to 15% of the number participating in Ohio's last gubernatorial election. Ohio Rev. Code §§ 3505.10, 3517.01.

strength of the American Independent Party is so substantial that no such requirement could possibly suffice to keep the Party's candidates off the presidential ballot. Ohio's requirements are so high, they contend, that the legislative purpose behind those requirements can be only to keep new parties—even those that, like the American Independent Party, have gained considerably more than "splinter" support—off the ballot. And such requirements, they conclude, thus deny persons in their position equal protection of the laws.

Ohio for its part concedes that the legislative objective underlying the statutes in question is to prevent the appearance on its ballot of slates of presidential electors whose substantial party support has not been timely demonstrated. That the basic classification drawn by the provisions is not "irrelevant to the achievement of the State's objective"—the traditional standard for judging the validity of a legislative classification under the Equal Protection Clause—is clear. The Court seems to concede as much, but nonetheless holds that the Ohio provisions are invalid—a result which may rest in part, I believe, upon possible doubts regarding the permissibility of the legislative objective itself. The propriety of that objective is, then, a critical issue for determination.

### III.

I can discern no basis for the position that Ohio's objective is in any way an illegitimate one. Surely a State may justifiably assert an interest in seeing that its presidential electors vote for the candidate best able to draw the support of a majority of voters within the State. By preventing parties that have not demonstrated timely and widespread support from gaining places on its ballot, Ohio's provisions tend to guard against the possibility that small-party candidates will draw enough support to prevent either of the major contenders from obtaining

an absolute majority of votes—and against the consequent possibility that election may be secured by candidates who gain a plurality but who are, *vis-à-vis* their principal opponents, preferred by less than half of those voting.[8] Surely the attainment of these objectives is well within the scope of a State's authority under our Constitution. One may perhaps disagree with the political theory on which the objectives are based, but it is inconceivable to me that the Constitution imposes on the States a political philosophy under which they must be satisfied to award election on the basis of a plurality rather than a majority vote.

In pursuing this interest Ohio has, at the same time, not completely prevented new parties from gaining access to that State's ballot. It has authorized ballot position for parties that can demonstrate by petition the support of 15% of the voting public 90 days before a primary election is to be held. My Brethren seem to suggest that the percentage figure is set too high, and the date too early. But I cannot join in this kind of second-guessing. While necessarily arbitrary, Ohio's standards can only be taken to represent reasonable

---

[8] This interest, which several States have chosen to protect in the context of state and local primary contests by providing for runoff elections, may be illustrated by a hypothetical example. Assume a State in which a dissident faction of one of the two major parties—party A—becomes dissatisfied with that party's nominees and sets itself up as a "third party"—party C—putting forward candidates more to its liking. Still, the members of party C much prefer the candidates of party A to those of party B. A situation is possible in which party B's candidates poll, for example, 46% of the vote, party A's candidates 44%, and party C's candidates 10%. Party B's candidates would in such a situation be elected by plurality vote. In an election involving only the candidates of parties A and B, however, those persons preferring party C's candidates might well have voted overwhelmingly for party A's, thus giving party A's candidates a substantial majority victory.

attempts at accommodating the conflicting interests involved.[9]

Although Ohio's provisions do not freeze the Republican and Democratic Parties into the State's election structure by specific reference to those parties, it is true that established parties, once they become participants in the electoral process, continue to enjoy ballot position so long as they have polled 10% of the vote in the most recent Ohio gubernatorial election. It is suggested that the disparity between this figure and the 15% requirement applicable to new parties is invidiously discriminatory. But I cannot accept the theory that Ohio is constitutionally compelled to apply precisely the same numerical test in determining whether established parties enjoy widespread support as it applies in determining that question with regard to new parties.

It is by no means clear to me that as an abstract matter there are no differences between parties that have long been on the ballot in a State and those that have not, such as might justify disparate standards for determining in those two classes of cases when widespread support, required for ballot position, has been demonstrated. In any event, I cannot conclude that the disparity involved here denies equal protection of the laws. The difference in figures is a difference between the requirements for getting on and staying on the ballot. It seems to me to be well within the State's powers to set somewhat different standards for those two requirements, so long as it applies them uniformly to all political parties. The only remaining argument would seem to be that the Republican and Democratic Parties never had to meet the 15% requirement: they were on the ballot in Ohio at the time the statutory scheme was

---

[9] The date specified, for instance, is related to Ohio's requirement that all political parties hold primary elections—another provision that is, it seems to me, well within the State's power to enact.

enacted, and so have had only to make certain they remain on by meeting the 10% standard. But the Ohio Legislature could well have taken notice at the time the provisions were enacted that the parties which had polled over 10% of the vote in the most recent gubernatorial election—the Republican and Democratic Parties—had both demonstrated strength far beyond the 15% figure specified for ballot entry by new parties. It seems to me totally unrealistic, therefore, to conclude that this minor disparity in standards cannot be justified by "any state of facts [that] reasonably may be conceived." *McGowan* v. *Maryland, supra,* at 426.

## IV.

The Court's opinion appears to concede that the State's interest in attempting to ensure that a minority of voters do not thwart the will of the majority is a legitimate one, but summarily asserts that this legitimate interest cannot constitutionally be vindicated. That assertion seems to echo the claim of my concurring Brethren—a claim not made by the appellants—that Ohio's statutory requirements in some way infringe upon First Amendment rights. I cannot agree.

As the language of Art. II, § 1, and a great deal of history under that section make clear, there is no constitutional right to vote for presidential electors.[10] I take it, therefore, that the First Amendment theory of my Brethren rests on the view that, despite the legitimacy of the objective underlying Ohio's laws, those laws nonetheless have the effect of stifling the activity of persons who disagree with the major political parties now in existence. The concurring opinions cite a series of decisions protecting what has been termed the First

---

[10] Cf. *Minor* v. *Happersett,* 21 Wall. 162, 178:

"[T]he Constitution of the United States does not confer the right of suffrage upon any one . . . ."

Amendment right of association. *NAACP* v. *Button,* 371 U. S. 415; *Bates* v. *Little Rock,* 361 U. S. 516; *NAACP* v. *Alabama,* 357 U. S. 449; *Thomas* v. *Collins,* 323 U. S. 516; *De Jonge* v. *Oregon,* 299 U. S. 353. In my view, however, the principles on which those decisions were based do not call for today's result.

In *Thomas* v. *Collins* and *De Jonge* v. *Oregon, supra,* the very design of the statutes in question was to prevent persons from freely meeting together to advance political or social views. Ohio's laws certainly are not of that nature. In the other three cases cited, all involving the activities of the National Association for the Advancement of Colored People, the statutes challenged were not on their face calculated to affect associational rights. We were able to determine with a good deal of certainty in those cases, however, (1) that application of the statutes to the NAACP would clearly result in a considerable impairment of those rights, and (2) that the interest said to underlie the statutes was insubstantial in the contexts presented. I believe that those conclusions should as a general matter be regarded as prerequisites to any holding that laws such as those involved here, which serve a legitimate state interest but are said to have some impact on First Amendment activity, are invalid. Cf. *United States* v. *O'Brien,* 391 U. S. 367.

In *NAACP* v. *Alabama, supra,* for instance, where the NAACP was ordered in accord with state law to disclose its membership lists, we outlined the issues as follows:

> "We think that the production order, in the respects here drawn in question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association. Petitioner has made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and

other manifestations of public hostility. Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

.        .        .        .        .

"We turn to the final question whether Alabama has demonstrated an interest in obtaining the disclosures it seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association. . . .

.        .        .        .        .

". . . The exclusive purpose [of the state authorities] was to determine whether petitioner was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question. The issues in the litigation commenced by Alabama by its bill in equity were whether the character of petitioner and its activities in Alabama had been such as to make petitioner subject to the registration statute, and whether the extent of petitioner's activities without qualifying suggested its permanent ouster from the State. Without intimating the slightest view upon the merits of these issues, we are unable to perceive that the disclosure of the names of petitioner's rank-and-file members has a substantial bearing on either of them. . . ."   357 U. S., at 462–464.

And in *Bates* v. *Little Rock, supra,* where an almost identical requirement was involved, we stated:

"On this record it sufficiently appears that compulsory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members. There was substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm. There was also evidence that fear of community hostility and economic reprisals that would follow public disclosure of the membership lists had discouraged new members from joining the organizations and induced former members to withdraw. This repressive effect, while in part the result of private attitudes and pressures, was brought to bear only after the exercise of governmental power had threatened to force disclosure of the members' names. . . . Thus, the threat of substantial government encroachment upon important and traditional aspects of individual freedom is neither speculative nor remote.

"Decision in this case must finally turn, therefore, on whether the cities as instrumentalities of the State have demonstrated so cogent an interest in obtaining and making public the membership lists of these organizations as to justify the substantial abridgment of associational freedom which such disclosures will effect. . . .

· · · · ·

"In this record we can find no relevant correlation between the power of the municipalities to impose occupational license taxes and the compulsory disclosure and publication of the membership lists of the local branches of the National Association for the

Advancement of Colored People. . . ." 361 U. S., at 523–525.[11]

Here, there certainly is no comparable showing that Ohio's ballot requirements have any substantial impact on the attempts of political dissidents to organize effectively. Such persons are entirely free to assemble, speak, write, and proselytize as they see fit. They are free either to attempt to modify the character of the established major parties or to go their own way and set up separate political organizations. And if they can timely demonstrate that they have substantial support within the State—according to Ohio's reasonable standards for deciding that question—they may secure ballot position for the candidates they support. Ohio has restricted only their ability to secure ballot position without demonstrating that support. To me the conclusion that that single disability in any way significantly impairs their First Amendment rights is sheer speculation. As my Brethren's surveys of ballot requirements in the various States suggest, the present two-party system in this country is the product of social and political forces rather than of legal restrictions on minority parties. This Court has been shown neither that in States with minimal ballot restrictions third parties have flourished, nor that in States with more difficult requirements they are moribund. Mere speculation ought not to suffice to strike down a State's duly enacted laws.

Nor, I think, can we with any confidence conclude that Ohio's interest in attempting to ensure that the will of the majority shall prevail is an insubstantial one. It requires more insensitivity to constitutional principles of federalism than I possess to tell Ohio that that interest is, ac-

---

[11] The NAACP cases, furthermore, held invalid only the application of the state laws in question to the parties involved. Here, however, Ohio is told, as I read the opinion of the Court and the concurring opinions, that it cannot in any circumstances validly enforce its ballot requirements.

cording to this Court's scale of values, somehow unworthy of implementation.[12]  I cannot conclude, therefore, that First Amendment principles call for the result reached today.

### V.

It is thought by a great many people that the entire electoral college system of presidential selection set up by the Constitution is an anachronism in need of major overhaul.[13]  As a citizen, I happen to share that view. But this Court must follow the Constitution as it is written, and Art. II, § 1, vests in the States the broad discretion to select their presidential electors as they see fit. The method Ohio has chosen may be unwise as a matter of policy, but I cannot agree that it violates the Constitution.[14]

MR. JUSTICE WHITE, dissenting in No. 543 and concurring in No. 544.

I agree with much of what my Brother STEWART says in his dissenting opinion in No. 543.  In my view, neither

---

[12] My Brother HARLAN suggests that Ohio's interest may be protected in "less restrictive" ways.  In light of the views I have stated above, I do not see why Ohio should be compelled to utilize one method for achieving its ends rather than another.  In any event, each of the methods mentioned by MR. JUSTICE HARLAN appears to me to entail consequences which arguably would frustrate other legitimate state interests.  Nor do all of them serve as effectively to promote the interest in question here as does the statutory scheme the Ohio Legislature has in fact enacted.  I do not think problems such as those raised in this case can be solved by means of facile and unelaborated suggestions of "less restrictive alternatives"; issues of legislative policy are too complex for such easy answers to be satisfactory.

[13] Similar suggestions were being made as early as 1804, at the time of the adoption of the Twelfth Amendment.  See *McPherson* v. *Blacker,* 146 U. S. 1, 33.

[14] For the reasons stated in this opinion, and the further reasons stated in Part IV of the opinion of the Court, I agree with the Court's denial of equitable relief to the appellants in No. 544, the *Socialist Labor Party* case.

the Due Process Clause nor the Equal Protection Clause of the Fourteenth Amendment prohibits Ohio from requiring that the appointment of presidential electors be carried out through the political party process. The Court does not hold that Ohio must accord ballot position to those who are unwilling to work through the framework of an established or nascent political party, nor do I understand appellants to make this contention. In this connection, there is no suggestion in the majority opinion that Ohio, merely by requiring potential candidates to participate in a primary, has acted unreasonably. Indeed, this requirement provides the opportunity for the presentation and winnowing out of candidates which is surely a legitimate objective of state policy. Nor is it held that Ohio's requirement, pursuant to this objective, that parties must show their base of popular support by obtaining the signatures of 15% of Ohio's gubernatorial voters is itself unreasonable.

In the face of such requirements, which neither alone nor in combination are unconstitutional, I do not understand how the American Independent Party may be ordered on the ballot over the objections of the State. The Independent Party has not complied with the provision that it show a sufficient base of popular support in time for participation in a primary. Indeed, the Party made no effort whatsoever to comply with these provisions. It claims it secured the necessary number of signatures but admits it wholly ignored the requirement that the petitions be filed prior to the primary election date. Had it filed them, and been denied participation in the primary or the election for failure to meet some other requirement, the case would be very different. But it did not even commence judicial challenge of the signature requirement, not to mention gathering signatures, in time to participate in the primary. The Independent Party is in no position to complain that it would have been impos-

sible for its members to gather the necessary signatures—which they were in fact able to assemble subsequently—or that it might in its progress toward ballot position have encountered some later obstacle.

That other Ohio provisions related to later phases of the election process might have imposed unconstitutional barriers to ballot position is no reason to excuse the Independent Party from complying with those preconditions which the State may validly impose. Why a majority of the Court insists on holding the primary petition requirement impermissible, not on its own demerits, but because it appears in the statute books with more questionable provisions is the major mystery of the majority position. Neither the Independent nor the Socialist Labor Party is entitled to relief in this Court.

MR. CHIEF JUSTICE WARREN, dissenting.

We have had but seven days to consider the important constitutional questions presented by these cases. The rationale of the opinion of the Court, based both on the Equal Protection Clause and the First Amendment guarantee of freedom of association, will apply to all elections, national, state, and local. Already, litigants from Alabama, California, Illinois, and Virginia have requested similar relief virtually on the eve of the 1968 presidential election. I think it fair to say that the ramifications of our decision today may be comparable to those of *Baker* v. *Carr,* 369 U. S. 186 (1962), a case we deliberated for nearly a year.[1] Appellants' belated requests for extraordinary relief have compelled all members of this Court to decide cases of this magnitude without the unhurried deliberation which is essential to the formulation of sound constitutional principles.

---

[1] *Baker* was originally argued on April 19–20, 1961. On May 1, 1961, it was set for reargument and was reargued on October 9, 1961. Our decision was not announced until March 26, 1962, over 11 months after the original argument.

## I.

I cannot agree that the State of Ohio should be compelled to place the candidates of the American Independent Party on the ballot for the impending presidential election. Nor can I draw a distinction between this Party and the Socialist Labor Party. Both suits were filed in July of this year, and both were decided on August 29, 1968. The following week the American Independent Party petitioned the Circuit Justice for its Circuit for provisional relief, which was granted on September 10. The Socialist Labor Party sought similar relief only three days after the September 10 order was issued. MR. JUSTICE STEWART granted provisional relief to one, but denied it to the other. No Ohio statutory deadline compelled that result, and presumably Ohio could have complied with an order granting the same relief to both Parties.[2] Both Parties should be treated alike; otherwise, we are bowing to a show of strength rather than applying constitutional principles.

Appellants have invoked the equity jurisdiction of the federal courts. Placed in this context, the litigation be-

---

[2] MR. JUSTICE STEWART based his denial of the Socialist Labor Party's request for provisional relief upon the following considerations: "the late date on which this motion was presented, the action already taken by the Ohio authorities, the relief already granted the appellants by the district court, and the fact that the basic issues they present will be fully canvassed in the argument of the appeal in *Williams* v. *Rhodes* . . . ." He did not suggest that the State of Ohio made any representations that it could not comply with an order granting the Socialist Labor Party the same relief already granted the American Independent Party.

I do not think any significance should be given to the fact that the interim relief granted by MR. JUSTICE STEWART made it physically possible to place the American Independent Party on the ballot. This relief, as explicitly recognized by MR. JUSTICE STEWART, was granted solely to allow Ohio to comply with all possible orders of this Court.

fore us presents an issue not treated by the opinion of the Court: did the District Court abuse its discretion in denying the extraordinary equitable relief requested by appellants? [3]  A review of the facts before the District Court convinces me that it did not, and therefore the emergency relief sought by appellants should be denied.

The Socialist Labor Party has been an organized political party in Ohio since the end of the 19th century, and although it has not achieved ballot position since the enactment in 1948 of the laws it challenges,[4] not until July 2, 1968, did it press its claims for equitable relief. Similarly, the supporters of George C. Wallace did not institute their action until July 29, 1968, although early in 1967 Governor Wallace had expressed interest in the Presidency,[5] and, in the spring of that year, he voiced concern for the restrictive nature of Ohio's qualifying laws.[6]

Nevertheless, neither the American Independent Party nor the Socialist Labor Party made an effort to comply with Ohio's election laws.  Nor has either timely invoked the jurisdiction of the courts.  That both had the opportunity to do so cannot be denied.  Because the

---

[3] This is the traditional standard for review of the denial of equitable relief. See, e. g., Brotherhood of Locomotive Engineers v. M.-K.-T. R. Co., 363 U. S. 528, 535 (1960); United Fuel Gas Co. v. Public Serv. Comm'n, 278 U. S. 322, 326 (1929).

[4] Appellants' Complaint in No. 544, pp. 1–2.

[5] New York Times, Jan. 26, 1967, p. 20, col. 3.

[6] Commencing in late April 1967, Governor Wallace began a four-day tour of selected northern States. At a press conference in Pittsburgh on April 27 he stated that he expected to run for President in all 50 States and that it might be necessary to institute suit in States where third parties had difficulty obtaining ballot position. Aides to the Governor mentioned California and Ohio as States in which difficulty might be encountered. New York Times, April 28, 1967, p. 28, col. 5.

State of Ohio does not challenge the validity of the signatures gathered by the American Independent Party, a majority of this Court assumes they reflect the strength of that Party in Ohio. However, since the signatures were not submitted to Ohio in timely compliance with the State's election laws, they have never been verified; in fact, appellants in No. 543 did not seek to file their signatures until over five months after the statutory filing date.[7]

Despite these delays in instituting suit and the failure of either party to make an effort to comply with any of Ohio's election laws, the District Court ordered Ohio to provide for write-in voting. This relief guaranteed that each Ohio voter would have the right to vote for the candidate of his choice, including the candidates of these two Parties. At worst, therefore, denying appellants a position on the ballot for the 1968 election prevented their candidates from competing on a completely equal basis with the candidates of the two major parties.

The imminence of the election, the Parties' failure to comply with Ohio law and the District Court's grant of partial relief must be considered in conjunction with the need to promote orderly federal-state relationships. Our reports are replete with decisions concerning the nature of the relief to be afforded in these sensitive areas, yet the opinion of the Court does not address itself to the principles of these cases. In the analogous area of legislative apportionment, we have often tolerated a temporary dilution of voting rights to protect the legitimate interests of the States in fashioning their own elec-

---

[7] The Ohio election laws require that petitions for a position on the Ohio ballot be filed 90 days before the state primary. Ohio Rev. Code §§ 3513.256–3513.262, 3517.01 (1960 Repl. Vol.). Appellants in No. 543 concede in their brief that their deadline was February 7, 1968, yet they apparently did not attempt to file their petitions until late in July. Appellants' Brief 86.

tion laws, see, *e. g., Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 739 (1964); cf. *Davis* v. *Mann,* 377 U. S. 678, 692–693 (1964); and in the area of school desegregation we have demonstrated even greater deference to the States. On occasion, we have even counseled abstention where First Amendment rights have been allegedly infringed by state legislation. See *Harrison* v. *NAACP,* 360 U. S. 167 (1959).

For example, in *WMCA, Inc.* v. *Lomenzo,* 377 U. S. 633 (1964), holding unconstitutional the apportionment of New York's Legislature, we stated that on remand the District Court "acting under equitable principles, must now determine whether, because of the imminence of that election *and in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan,* it would be desirable to permit the 1964 election of legislators to be conducted pursuant to the existing [unconstitutional] provisions, or whether under the circumstances the effectuation of appellants' right to a properly weighted voice in the election of state legislators should not be delayed beyond the 1964 election." [8] *Id.,* at 655. (Emphasis added.)

---

[8] The prior history of *Preisler* v. *Secretary of State,* 279 F. Supp. 952 (D. C. W. D. Mo. 1967), probable jurisdiction noted *sub nom. Kirkpatrick* v. *Preisler,* 390 U. S. 939 (1968), aptly demonstrates the deference we have paid legislative action in this area. On January 4, 1965, the United States District Court for the Western District of Missouri held that the 1961 Missouri Congressional Redistricting Act was unconstitutional, but it refused to grant any additional relief "until the Legislature of the State of Missouri has once more had an opportunity to deal with the problem . . . ." *Preisler* v. *Secretary of State,* 238 F. Supp. 187, 191 (D. C. W. D. Mo. 1965). The Missouri General Assembly then enacted the 1965 Congressional Redistricting Act. On August 5, 1966, the District Court held this new plan unconstitutional, but it nevertheless permitted the 1966 Missouri congressional elections to be conducted under the void act. *Preisler* v. *Secretary of State,* 257 F. Supp. 953

*Green* v. *County School Board,* 391 U. S. 430 (1968), decided only last Term, provides an even more striking example of our concern for the need to refrain from usurping the authority of the States in areas traditionally entrusted to them. *Green* reached this Court 13 years after *Brown* v. *Board of Education,* 349 U. S. 294 (1955), required that schools be established free of racial discrimination with "all deliberate speed." Although we held in *Green* that the particular "freedom-of-choice" plan adopted by the school board did not pass constitutional muster, the case was remanded to the District Court so that the school board could once again attempt to formulate a constitutional plan.

The result achieved here is not compatible with recognized equitable principles, nor is it compatible with our traditional concern, manifested in both the reapportionment and school desegregation cases, for preserving the properly exercised powers of the States in our federal system. Moreover, in none of these analogous areas did we deal with an express constitutional delegation of power to the States. That delegation is unequivocal here. U. S. Const., Art. II, § 1.

The net result of the Court's action is that this Court is writing a new presidential election law for the State of Ohio without giving the Legislature or the courts of that State an opportunity to appraise their statutes in litigation [9] or to eliminate any constitutional defects

(D. C. W. D. Mo. 1966). We affirmed on January 9, 1967, *sub nom. Kirkpatrick* v. *Preisler,* 385 U. S. 450. In 1967, the Missouri General Assembly made still another attempt to enact a constitutional plan, but on December 29, 1967, this plan was also invalidated. 279 F. Supp. 952.

[9] Cf. *Scott* v. *Germano,* 381 U. S. 407, 409 (1965), in which we stated that the "power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged."

prior to a decision by this Court. Given both the lateness of the hour and the legitimate demands of federalism, the District Court did not abuse its discretion in denying the extraordinary relief appellants demanded.

## II.

Although I believe that the court below properly exercised its discretionary equitable powers, this litigation involves far more than a resolution of whether either Party is entitled to ballot position for the 1968 election. Appellants' request for declaratory relief, challenging the constitutionality of Ohio's system of conducting presidential elections, has raised a question which may be fairly classified as one of first impression: [10] to what extent may a State, consistent with equal protection and the First Amendment guarantee of freedom of association, impose restrictions upon a candidate's desire to be placed upon the ballot? As I have already stated, the principles which would of necessity evolve from an answer to this question could not be confined either to the State of Ohio or to presidential elections.

Both the opinion of this Court and that of the District Court leave unresolved what restrictions, if any, a State can impose. Although both opinions treat the Ohio statutes as a "package," giving neither Ohio nor the courts any guidance, each contains intimations that a State can by reasonable regulation condition ballot posi-

---

[10] *MacDougall* v. *Green,* 335 U. S. 281 (1948), did contest the constitutionality of Illinois' system of nominating candidates representative of new political parties. However, *MacDougall* was decided during the reign of *Colegrove* v. *Green,* 328 U. S. 549 (1946). *Baker* v. *Carr,* 369 U. S. 186 (1962), and its progeny have substantially modified the constitutional matrix in this area. *Fortson* v. *Morris,* 385 U. S. 231 (1966), although concerning the constitutionality of state election laws, involved consideration of a State's post-election procedure, not state requirements for initial ballot qualification.

tion upon at least three considerations—a substantial showing of voter interest in the candidate seeking a place on the ballot, a requirement that this interest be evidenced sometime prior to the election, and a party structure demonstrating some degree of political organization. With each of these propositions I can agree. I do not believe, however, as does MR. JUSTICE STEWART, that the Equal Protection Clause has only attenuated applicability to the system by which a State seeks to control the selection of presidential electors.

Whatever may be the applicable constitutional principles, appellants and the State of Ohio are entitled to know whether any of the various provisions attacked in this litigation do comport with constitutional standards. As demonstrated by *Zwickler* v. *Koota*, 389 U. S. 241 (1967),[11] this matter should be first resolved by the court below. Given the magnitude of the questions presented and the need for unhurried deliberation, I would dispose of appellants' request for declaratory relief in a manner consistent with *Zwickler* by a remand to the District Court for a clearer determination of the serious constitutional questions raised in these cases.

I must therefore dissent from the failure of the Court's opinion to explore or dispose adequately of the declaratory judgment actions, as well as from the grant of extraordinary relief in No. 543.

---

[11] "We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." 389 U. S., at 254.