**GEORGIA SOCIALIST WORKERS PARTY, Linda Jenness, Joseph Frederick Cole, Francis Grinnon, Clifford D. Conner, and Jim Gwin**

v.

**Ben W. FORTSON, Jr., Individually and as Secretary of State of the State of Georgia.**

**Civ. A. No. 13515.**

United States District Court,
N. D. Georgia,
Atlanta Division.

June 22, 1970.

Probable Jurisdiction Noted
Oct. 26, 1970.

See 91 S.Ct. 127.

---

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., Harold N. Hill, Jr., Executive Asst. Atty. Gen., Robert J. Castellani, Asst. Atty. Gen., Atlanta, Ga., for defendant.

Before BELL, Circuit Judge, and EDENFIELD and HENDERSON, Judges.

EDENFIELD, District Judge:

The relevant facts in this action for declaratory and injunctive relief are not disputed. Plaintiff Georgia Socialist Workers Party (hereinafter GSWP) is a "political organization" within the meaning of Ga.Code Ann. § 34–103(t). Plaintiff Linda Jenness is a member of GSWP and desires to be a candidate for governor of Georgia. Plaintiffs Cole and Grinnon are GSWP members and desire to be candidates for Congress for the Fourth and Fifth Congressional Districts, respectively. Plaintiffs Conner and Gwin are voters in the Fourth and Fifth Districts, respectively. They desire to represent, as a class, all registered Georgia voters who desire to consider persons on the Georgia general election ballot other than Democratic or Republican nominees. Defendant Fortson is the Georgia Secretary of State.

Plaintiffs initially attacked the provisions for nominating petitions for non-party candidates under former Ga. Code Ann. § 34–1010 and provisions for qualification fees under former Ga.Code Ann. § 34–1004. These provisions were amended by House Bill No. 1304 which was approved by the Governor of Georgia on March 20, 1970. The United States Attorney General has approved these amendments to the election code as required by Section 5 of the Voting Rights Act of 1965. By amendment, plaintiffs now attack the comparable provisions of the new law.

Under the current Georgia law a "political party" is a political organization having candidates or electors who received 20% of the votes cast at the preceding gubernatorial or presidential election. Ga.Code Ann. § 34–103(u). A "political body" is a political organization which, like GSWP, did not maintain candidates for governor or presidential elector who received 20% of the vote in the preceding gubernatorial or presidential election. Ga.Code Ann. § 34–103(s).

While political parties may nominate candidates through primaries without submitting nominating petitions, nominees of "political bodies" and independent candidates must file nominating petitions to obtain ballot space. Ga.Code Ann. § 34–1001. These nominating petitions must include the names "of not less than five percent of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking * * *." Ga.Code Ann. § 34–1010(b). The total time allowed for circulating nominating petitions is 180 days (Ga.Code Ann. § 34–1010(e)); and the petitions must be filed by 12:00 noon on the second Wednesday in June. Ga.Code Ann. § 34–1001(b). Plaintiffs allege the petition requirements above create an invidious distinction between party members and non-party members and therefore violate plaintiffs' Fourteenth Amendment rights to equal protection of the law. Furthermore, plaintiffs allege the petition requirements unconstitutionally burden their First Amendment rights to freedom of speech, petition and association as well as their "right to vote."

Concerning the qualification fee requirements, current Georgia law provides that the qualification fee for candidates for gubernatorial and congressional office shall be 5% of the annual salary of the office. Ga.Code Ann. § 34–1013(a) (2). For the 1970 election the fees for the office of governor and congressman are $2125. Plaintiffs Jenness, Cole and GSWP have filed affidavits saying they cannot afford to pay the filing fees because of poverty. Plaintiffs allege the fee requirements invidiously discriminate against poor people in violation of the Equal Protection Clause; furthermore, plaintiffs allege the fee requirements deny poor people the right to run for office, to vote for candidates of their choice and to petition for redress of grievances in violation of the First and Fourteenth Amendments.

Plaintiffs allege jurisdiction under 28 U.S.C.A. §§ 1331, 1343(3) and (4), and 28 U.S.C.A. § 2201. The action is brought under 42 U.S.C.A. § 1983 and injunctive and declaratory relief is requested. Upon plaintiffs' application, a three-judge court was constituted pursuant to 28 U.S.C. §§ 2281, 2284, because plaintiffs are seeking injunctive relief against a statute of state-wide application. Plaintiffs have moved for summary judgment and filed supporting affidavits.

## I. *Standing*

■ At the outset, the standing of the various parties to challenge the Georgia laws should be considered. Regarding the challenge to the nomination petition requirements, non-party candidates Jenness, Cole and Grinnon certainly have standing to challenge the requirements directly affecting them. The GSWP would also have standing to challenge the petition requirements. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968). The standing of voters Conner and Gwin could be questioned. Jenness v. Little, 306 F.Supp. 925, 927 (N.D.Ga.1969). The Court has not hesitated to find standing where voters were contesting denial of access to the ballot. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). Thus, it could be argued, voters should also have standing to contest the constitutionality of the content of the ballot to which they receive access. But in any event, since the candidates and GSWP clearly have standing to raise all the issues, and the voters do not request any relief not requested by the candidates and GSWP, the question of the voters' standing is not crucial. Regarding the qualification fee requirements, candidates Jenness, Cole and Grinnon again have standing. The GSWP would also have standing to challenge the fees to which its candidates are subjected. Again, the question of the voters' standing is not clear, but is not crucial since other plaintiffs have stand-

ing to assert all the allegations raising the questions to be considered.

## II. *Nominating Petition Requirements*

Plaintiffs base their claim that the nominating petition requirements violate plaintiffs' rights to equal protection of the law on Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In *Williams* the plaintiffs attacked a series of Ohio election laws requiring, among other things, that presidential electors for non-party candidates file petitions signed by voters totaling 15% of the number of ballots cast in the last preceding gubernatorial election. Candidates of political organizations qualifying as parties did not have to file nominating petitions. Considering these *and other* Ohio election laws, the Court held "the *totality of the Ohio restrictive laws taken as a whole* imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause." (Emphasis supplied.) 393 U.S. at 34, 89 S.Ct. at 12.

But the maze of Ohio laws struck down in *Williams* contained restrictions far more severe than Georgia's simple requirement concerning the number of names required on a nominating petition. It would be difficult to describe the combined restrictions imposed by Ohio any better than did Mr. Justice Douglas in his concurring opinion in Williams. As he says:

"Ohio, through an entangling web of election laws, has effectively foreclosed its presidential ballot to all but Republicans and Democrats. It has done so initially by abolishing write-in votes so as to restrict candidacy to names on the ballot; it has eliminated all independent candidates through a requirement that nominees enjoy the endorsement of a political party; it has defined 'political party' in such a way as to exclude virtually all but the two major parties.

"A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election. In this election year, 1968, a candidate would need 433,100 such signatures. Moreover, he must succeed in gathering them long before the general election, since a nominating petition must be filed with the Secretary of State in February. That is not all: having compiled those signatures, the candidate must further show that he has received the nomination of a group which qualifies as a 'political party' within the meaning of Ohio law. It is not enough to be an independent candidate for President with wide popular support; one must trace his support to a political party.

"To qualify as a party, a group of electors must participate in the state primary, electing one of its members from each county ward or precinct to a county central committee; two of its members from each congressional district to a state central committee; and some of its members as delegates and alternates to a national convention. Moreover, those of its members who seek a place on the primary ballot as candidates for positions as central committeemen and national convention delegates must demonstrate that they did not vote in any other party primary during the preceding four years; and must present petitions of endorsement on their behalf by anywhere from five to 1,000 voters who likewise failed to vote for any other party in the last preceding primary. Thus, to qualify as a third party, a group must first erect elaborate political machinery, and then rest it upon the ranks of those who have proved both unwilling and unable to vote.

"Having elected a central committee, the group has it convene a state convention attended by 500 delegates duly apportioned throughout the State according to party strength. Delegates to the state convention then go on to choose presidential electors for certification on the November ballot, while elected delegates to the national

convention go on to nominate their candidate for President. Ohioans, to be sure, as a result of the decision below, enjoy the opportunity of writing in the man of their choice on the ballot. But in a presidential election a vote for a candidate is only operative as a vote for the electors representing him; and where the State has prevented that candidate from presenting a slate of electors for certification, the write-in vote has no effect. Furthermore, even where operative, the write-ins are no substitute for a place on the ballot." 393 U.S. at 35–37, 89 S.Ct. at 13–14 (Douglas, J., concurring).

It takes no more than a glance at these combined requirements to see that the Court, in *Williams*, was confronted with much more than a single statute requiring the signatures of 5% of the voters on a nominating petition. Moreover, the Court in *Williams* did not strike down even a 15% requirement as such. Indeed, the Court was very careful to make it clear that it did not do so, and it appears that only Mr. Justice Harlan thought it was exorbitant. As previously stated, what the Court did strike down in *Williams* was the *combination* of restrictions, considering their total effect. This appears from every opinion in the case, majority, concurring, and dissenting. As the majority says:

> "Considering these Ohio laws *in their totality*, this [the State's] interest cannot justify the very severe restrictions on voting and associational rights which Ohio has imposed." (Emphasis supplied.) *Id.* at 32, 89 S.Ct. at 11.

Again:

> "These barriers of party, timing, and structure are great obstacles. *Taken together* they render it difficult, if not impossible, for a man who disagrees with the two major parties to run for President in Ohio, to organize an opposition, and to vote a third ticket." (Emphasis supplied.) *Id.* at 38, 89 S.Ct. at 14 (Douglas, J., concurring).

Further:

> · "Cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote. *The totality* of Ohio's requirements has those effects." (Emphasis supplied.) *Id.* at 39, 89 S.Ct. at 15 (Douglas, J., concurring).

Elsewhere in the various opinions the Court discusses the 15% requirement as such and clearly indicates that the opinion of the Court is not based upon it alone. Thus, in the dissenting opinion of Mr. Justice White at page 62, 89 S.Ct. at pages 26–27, he said:

> "In this connection, there is no suggestion in the majority opinion that Ohio merely by requiring potential candidates to participate in a primary, has acted unreasonably. Indeed, this requirement provides the opportunity for the presentation and winnowing out of candidates which is surely a legitimate objective of state policy. *Nor is it held that Ohio's requirement, pursuant to this objective, that parties must show their base of popular support by obtaining the signatures of 15% of Ohio's gubernatorial voters is itself unreasonable."* (Emphasis supplied.) *Id.* at 62, 89 S.Ct. at 26–27.

Again, in the dissenting opinion of Mr. Justice Stewart, at page 55, 89 S.Ct. at page 23, the Court also said:

> "It is suggested that the disparity between this figure [10% for existing political parties] and the 15% requirement applicable to new parties is invidiously discriminatory. I cannot accept the theory that Ohio is constitutionally compelled to apply precisely the same numerical test in determining whether established parties enjoy widespread support as it applies in determining that question with regard to new parties.

> "It is by no means clear to me that as an abstract matter there are no differences between parties that have

long been on the ballot in a State and those that have not, such as might justify disparate standards for determining in those two classes of cases when widespread support, required for ballot position, has been demonstrated." *Id.* at 55, 89 S.Ct. at 23

Finally, at page 48, 89 S.Ct. at page 19, Mr. Justice Harlan, while expressing the opinion that 15% was too high, still left open the question as to what would be reasonable. In doing so, he said:

"Since Ohio's requirement is so clearly disproportionate to the magnitude of the risk that it may properly act to prevent, *I need not reach the question of the size of the signature barrier a State may legitimately raise against third parties on this ground.* This should be left to the Ohio Legislature in the first instance." (Emphasis supplied.) *Id.* at 48, 89 S.Ct. at 19.

At page 47, 89 S.Ct. at page 19, in a footnote, Mr. Justice Harlan also makes reference, without comment, to the signatures required by other states, listing them as follows:

"De minimis to 0.1% ...16 [States]
0.1% to 1% .........26 [States]
1.1% to 3% ..........3 [States]
3.1% to 5% .......... 4 [States]" [1]

Mr. Justice Warren summed up the matter in his dissent by saying:

"The net result of the Court's action is that this Court is writing a new presidential election law for the State of Ohio without giving the Legislature or the courts of that State an opportunity to appraise their statutes in litigation or to eliminate any constitutional defects prior to a decision by this Court." *Id.* at 68, 89 S.Ct. at 30.

Clearly, therefore, neither in *Williams* nor elsewhere has the Court ruled that the requirement of the signatures of 5%, or even 15%, of the voters on nominating petitions is unconstitutional. True, it may do so yet; but in the meantime this Court simply cannot say, as a matter of law, that Georgia's 5% is either unreasonable [2] or that it constitutes invidious, intentional, or purposeful discrimination as charged by the plaintiffs.

The prayers of the plaintiffs' petition respecting the signature requirements are denied.[3]

III. *Qualification Fee Requirements*

Plaintiffs also attack the requirement in Ga.Code Ann. § 34–1013 that candidates pay qualifying fees amounting to 5% of the annual salary of the office for

1. It is also interesting to note that of the states and territories five have petition requirements equalling those of Georgia: Oklahoma, District of Columbia, and Puerto Rico, like Georgia, require independent candidates to secure petitions containing the names of 5% of the eligible voters; Arkansas and North Carolina require in excess of 5% of the eligible voters. North Dakota requires either 10% of the votes cast or 300 signatures, whichever is less. Of the remaining 21 states having percentage requirements the percentage varies from ½% to 5% of the votes cast (not 5% of the eligible voters as required by Georgia). Another 22 states and territories have flat number requirements for signatures. Twenty of these states require from 25 to 2500 signatures. South Carolina requires 10,000 signatures and Illinois requires 25,000 signatures. Florida has no petition requirement.

2. The Court is strengthened in this conclusion by the fact that in the last general election in Georgia a Republican candidate for governor not only did qualify by obtaining the necessary signatures, but in fact went on to receive a plurality of the votes cast.

3. The Court might also comment on the fact that here, as in *Williams*, the plaintiffs started the present action so late as to make it difficult, if not impossible, to comply with the Georgia requirements. Under Georgia law signatures to a nominating petition may be solicited for a period of six months prior to the qualifying deadline and must be filed on the qualifying date. Here, the qualifying deadline was June 10th. The suit was not filed until February 18th so that approximately half the solicitation time had elapsed before the suit was brought. It thus appears that any additional inconvenience to plaintiffs on this ground they brought upon themselves.

which the candidates are running. Plaintiffs allege this fee requirement denies poor people equal protection of the law; in addition, the plaintiff voters and candidates allege the requirement violates their rights to vote and to run for office.

In Jenness v. Little, 306 F.Supp. 925 (N.D.Ga.1969), a three-judge court in this district expressed the opinion that "to prohibit candidates from getting their names on the ballot *solely* because they cannot post a certain amount of money is illegal and unconstitutional. (Emphasis supplied.)

There we went on to hold, however:

"We make no such holding with respect to the exaction of a qualifying fee in future elections where the candidate can get his name on the ballot in some other fashion, either by nominating petition, primary election, or pauper's affidavit. Whether the City in the future wishes to continue to collect reasonable qualifying fees in conjunction with such aternatives is a matter for the City to decide." *Id.* at 929.

We are aware that since that opinion a three-judge district court in Florida has apparently reached a different result, holding that the exaction of qualifying fees in general and qualifying fees of 5% of the annual salary in particular was legal, irrespective of indigency. Wetherington v. Adams, D.C., 309 F.Supp. 318, 320.

But, unlike the present case, *Wetherington* apparently involved a *primary* nomination, not an election, and so far as appears the prospective candidate was a regular party member, not an independent. This could explain the court's reasoning when it said:

"An additional purpose of the filing fees and assessments would appear to be to provide support, in a monetary form, to political parties so as to encourage and strengthen them. This becomes clear when it is considered that the filing fees do not go to the state to finance the costs of the elections. The filing fees, as well as the assessments themselves made by the party, go to qualified party executive committees. Fla.Stat. § 99.103 (1967), F.S.A. Thus, the purpose of fostering party growth and activity becomes apparent, and all the more so when it is considered that the state conducts the election free of charge." *Id.* at 321.

The *Wetherington* case is therefore not altogether in point; and while, as the *Wetherington* court says, it may be true that serious candidates traditionally attract money for their candidacy, we cannot say as a matter of law that one's candidacy is not serious or that he does not have the right to run merely because he does not have or has thus far failed to attract a certain amount of money.

■ In any event we adhere to our opinion in *Jenness, supra:* that to require of an indigent independent candidate in a general election that he come forward with both a nominating petition *and* a qualifying fee, with no other means of getting on the ballot, is a violation of equal protection.

After the hearing in this case, and as the qualifying date (June 10, 1970) approached, the Court entered an interim order postponing the qualifying date, as to these plaintiffs only, until June 22, 1970, pending further orders of the Court. Having now ruled that the plaintiffs do have to comply with the state requirements as to nominating petitions they are entitled to time within which to do so. It is therefore

Ordered and directed that if the plaintiffs comply with the nominating petition requirements of this opinion by filing their notice of candidacy accompanied by the petitions with the appropriate number of signatures by September 1, 1970, their names shall be entered on the ballot, and the defendant is hereby enjoined from further exacting from them a qualifying fee in such event and upon a showing of inability to pay the fee due to poverty.