The SOCIALIST WORKERS
PARTY et al.

v.

Mayor Louie WELCH et al.

Civ. A. No. 71-H-462.

United States District Court,
S. D. Texas,
Houston Division.

Oct. 27, 1971.

Stuart M. Nelkin and David H. Berg, Houston, Tex., for plaintiffs.

William A. Olson, City Atty., Joseph Rollins, Senior Asst. City Atty., Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

BUE, District Judge.

The Socialist Workers Party of Houston and four affiliates of that party bring this suit for relief from and redress of the deprivation of federal Constitutional rights, particularly those of due process and equal protection guaranteed by the Fourteenth Amendment. Plaintiffs' action arises under § 1 of the 1871 Civil Rights Act, 42 U.S.C. § 1983, this Court being asked to render declaratory relief pursuant to 28 U.S.C. § 2201 and for preliminary and permanent injunctive relief. Deborah Leonard is a member of the Socialist Workers Party seeking to file as a candidate for mayor; the three other named plaintiffs, Mareen Jasin, Paul McKnight and Jeanette Tracy, are also members of the Socialist Workers Party seeking to file as candidates for positions on the City Council.

Plaintiffs have complied with all filing requirements provided by the City Charter except for the payment of filing fees, art. 5, § 6, and the ownership of real property in the city for at least two years prior to election, art. 6, § 1. The required registration fee for mayoral candidates is $1,250; the fee for councilman candidates is $500.

Plaintiffs urge that their Fourteenth Amendment rights have been violated due to the requirements of a substantial registration fee and real property ownership as prerequisites to candidacy for city office. These criteria, it is said, operate to exclude from candidacy all persons but those of considerable affluence. Defendants would show that, while the restrictive provisions of the City Charter might operate to the detriment of poor persons seeking candidacy, a compelling governmental interest justifies the requirement. Without regulation of the ballot, it is asserted, the electoral process would be reduced to a state of hopeless confusion.

The right to vote was long ago defined as a fundamental political right, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). And the right to exercise the franchise includes the right to cast one's vote effectively, Carter v. Dies, 321 F.Supp. 1358, 1361 (N.D.Tex.1970), whether that effectiveness be measured quantitatively, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1954) (apportionment) or qualitatively, Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968) (right to choose one's candidate). It is axiomatic under recent Supreme Court decisions that the fundamental interests involved in voting rights are to be protected from encumbrances other than those necessary to serve a compelling governmental interest, Kramer v. Union Free School District, 395 U.S. 621, 628, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Harper v. Virginia State Board, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

Analysis of the most recent case law emanating from the Supreme Court evidences the view that ideas of what constitutes equal treatment under the equal protection clause of the Constitution do change. Mr. Justice Douglas voiced this view when speaking for the Court in Harper v. Virginia State Board, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), a case in which the poll tax was struck down. Similarly, the requirement of property ownership and the payment of a filing fee have been supported in the past to a significant degree because such requirements comported with state policies for the collection of revenue and were consistent with the belief that voters satisfying such qualifications would be those most interested in furthering a state's or a community's welfare when they vote, 383 U.S. at 677, 86 S.Ct. 1079 (dissent of Black, J.). Presumably, the elimination of such requirements on constitutional grounds in view of this recent modification in philosophy and application of the equal protection clause is not meant to diminish or alter that degree of interest or genuine concern exhibited by the local citizenry in voting as they see fit for the welfare of the community. Indeed, the opposite would be true, as the striking down of such requirements is theoretically meant to broaden participation in elections of the voting populace with consequent improved representative local government.

The same rationale would seem to apply when the requirements for candidates for office are considered. Civic responsibility is best demonstrated when, out of those who possess a significant stake and interest in the community and in the outcome of an election, are selected those names which ultimately appear on the ballot as candidates for city office. Although it is not for this Court to attempt to assess the full intentions of these plaintiffs in terms of reflecting bona fide civic responsibility, certain of their representations and admissions in sworn testimony in this case do serve to cast some fur-

ther light on the multiple problems faced by a city government in conducting a municipal election which cause it to seek some practicable and manageable way to pare down the number of candidates appearing on the ballot, thereby insuring that those participating as candidates in the election are serious in their intentions and possess some significant support among the voters.

All plaintiffs in this case satisfy the one year residency requirement recently passed by the state legislature in August, 1971. Twenty-five or thirty persons would constitute the vast majority of the members of the Socialist Workers Party in Harris County, Texas. (Depo. of Jeanette Bliss p. 9). The candidate for mayor, age 28, ran for the United States Senate on the Socialist Workers Party ticket in Seattle, Washington in 1968, and her husband ran for mayor in Seattle with the support of the Socialist Workers Party in 1969. (Depo. of Deborah Leonard, pp. 28–30). One of the candidates for city council was a candidate for District Attorney in Philadelphia, Pennsylvania in 1969, with Socialist Workers Party backing, although she is not and has never been an attorney, a situation which she characterized as "so funny" (Depo. of Mareen Jasin, pp. 13, 14). Another candidate for city council is 22 years old and running her first political race. She joined the Socialist Workers Party in 1968 and supported the Party ticket in Cleveland before moving to Houston. (Depo. Jeanette Tracy Bliss, p. 32). The last candidate for city council is 24 years old and a chairman of the Harris County Socialist Workers Party. (Depo. of Paul McKnight, pp. 5, 11). Before coming to Houston he lived in San Francisco, California for five years during part of which time he was a student at San Francisco State College where he participated in the student strike. (Depo. of Paul McKnight, pp. 11–13). He supported the Socialist Workers Party ticket in California in the 1968 elections. (Depo. pp. 18, 19). From December 27, 1968, to January 24, 1969, he was in Cuba as a member of a delegation from the Young Social-

ist Alliance which was invited there by the Cuban government to celebrate the 10th anniversary of the Cuban revolution (McKnight Depo. pp. 14, 15). He would not object to the violent overthrow of the government or the engaging in violence to this end if someone else did it. (*Id.* p. 26). Two of the candidates testified that they would probably support Russia in a war between the United States and Russia. (Depo. of Mareen Jasin, pp. 15, 16); (Depo. of Paul McKnight, p. 26). One of the candidates would not state which country she would support in the event of such a conflict. (Depo. of Jeanette Tracy Bliss, p. 31).

The test which this Court must employ in ascertaining the merit of the claims brought forward by these plaintiffs is the compelling interest test, a more stringent inquiry than the rational basis test utilized in areas of less fundamental nature than voting rights:

> Under the [compelling interest] standard a state must show both that it has a compelling interest which justifies its laws and that the distinctions drawn by the law are necessary to further its purpose.

The Supreme Court, 1968 Term, 83 Harv.L.Rev. 60, 93 n. 30 (1969).

Application of the compelling interest test is further necessitated in the instant case, "where lines are [sought to be] drawn on the basis of wealth * * *," McDonald v. Board of Election Commissioners, 394 U.S. 802, 807, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739 (1968).

### I.

Plaintiffs initially asserted in their complaint that the five year residency requirement instituted under the City Charter, art. 6 § 1, restricts the right of travel between cities and states, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), discriminates on the basis of length of residence, thus denying plaintiffs the equal protection of the law, and serves absolutely no purpose or interest save delay.

As of August 30, 1971, an amendment to the Texas Election Code art. 1.05–1,

V.A.T.S. providing for a one year residency requirement for all candidates of city office and repealing all laws and parts of law in conflict thereof, has been in force. This recent enactment by the Legislature prevails over inconsistent City Charter or ordinance provisions, Vernon's Ann.St.Tex.Const. art. XI § 5. The facts in the instant case, established by deposition, show that all plaintiffs have fulfilled and satisfied the one year requirement, thus rendering any attack based upon residency moot.

## II.

█ Second, it is urged that the requirement of real property ownership as a prerequisite to candidacy operates to exclude from candidacy all persons who are in poverty, and thus operates to create a classification of invidious discrimination on the basis of wealth. The requirement is defended by the explanation that, since the mayor and four councilmen compose the city Board of Assessment, which body is an adjustment board serving to "equalize the valuation of real property," these officers should qualify themselves by being owners of real property.

American tradition and history have long reflected the favored position of the freeholder in exercise of the franchise and in qualification for governmental office. While admitting the historical significance of this requirement, this Court feels compelled to reassess its contemporary importance in a nation characterized by a growing number of apartment dwellers and by an increased mobility of the voting populace. Whatever value real property ownership might have as an indication of stability and community attachment, or of expertise in property valuation, is not sufficient in itself to warrant the exclusion of office seekers on that basis. Just as the ownership of realty *per se* does not guarantee these attributes, a lack of property ownership does not indicate

necessarily that these qualities are absent, Turner v. Fouche, 396 U.S. 346, 363–364, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). This Court is in agreement with the decision reached by Judge Allan B. Hannay, Connerton v. Oliver, C.A. No. 71-H-330, 333 F.Supp. 201 (S.D. Tex., March 29, 1971) holding a similar real property ownership qualification unconstitutional as violative of the equal protection clause of the Fourteenth Amendment, and this Court so holds in the present case. *See also* Gonzales v. City of Sinton, Texas, 319 F.Supp. 189 (S.D.Tex.1970); Stapleton v. Clerk for the City of Inkster, 311 F.Supp. 1187 (E.D.Mich.1970).

## III.

█ The registration fee imposed by the city is questioned here on the same grounds as is the property ownership criterion. The philosophical mainstay of plaintiffs' position is the holding of the Supreme Court in Harper v. Virginia State Board, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). There, Virginia's poll tax was held violative of the equal protection clause of the Fourteenth Amendment, the Court holding that the affluence of a voter or the payment of a fee was an impermissible electoral standard. Jenness v. Little, 306 F. Supp. 925 (N.D.Ga.1969), appeal dism'd as moot sub nom., Matthews v. Little, 397 U.S. 94, 90 S.Ct. 820, 25 L.Ed.2d 81 (1970), made application of this restriction against a monetary *voter* qualification to a similar monetary criterion for *candidacy* for public office. That case, parallel to the instant case, found the payment of a filing fee to violate the due process and equal protection clauses of the Fourteenth Amendment. Such a violation was in no way cured by provision for a "write-in" ballot. In *Jenness*, and again in Carter v. Dies, 321 F.Supp. 1358 (N.D.Tex.1970), the alternative of a "write-in" candidacy was rejected:

Nor is it any answer to say that this is cured by the fact that a candidate

can run a 'write-in' campaign or that a voter can 'write in' the name of his candidate whether on the ballot or not. Atlanta has a charter provision requiring that such write-in ballots be permitted, but to force a candidate to seek election in this fashion is to throw too many hurdles in his path solely because he is without funds to qualify.

306 F.Supp. at 929. *Jenness* was an adjudication of the rights of a candidate; *Carter*, however, was decided as a question of the rights of a voter. The Court in the latter case specifically declined to reach the questions of candidates' rights and of standing. *Compare* Jenness v. Little, 306 F.Supp. 925, 927 (N. D.Ga.1969) *with* Carter v. Dies, 321 F. Supp. 1358, 1362 (N.D.Tex.1970). This distinction would seem to be minimal in importance, however, since the rights of each are so closely related to and affected by the other. *See* Connerton v. Oliver, C.A. No. 71–H–330, 333 F.Supp. 201, at pp. 202, 203 (S.D.Tex. March 29, 1971); *cf.* Georgia Socialist Workers Party v. Fortson, 315 F.Supp. 1035, 1037 (N.D.Ga.1970).

Notwithstanding such distinctions, there is evident a steady, inexorable movement in the direction of freeing the ballot from arbitrary or discriminatory controls. In Georgia Socialist Workers Party v. Fortson, 315 F.Supp. 1035 (N. D.Ga.1970) [hereinafter GSWP], the Court again followed *Jenness* in holding that the imposition of filing fees was unconstitutional as a discrimination on the basis of wealth:

> [W]e cannot say as a matter of law that one's candidacy is not serious or that he does not have the right to run merely because he does not have or has thus far failed to attract a certain amount of money.

*Id.* at 1041. It is important to note that these cases do *not* stand for the principle that ballot controls, *per se*, are un-

constitutional and must be abandoned. For instance, *GSWP* upheld the requirement of a qualifying petition wherein the obtaining of signatures of a certain percentage of the electorate was necessary in order for a candidate to be placed on the ballot, and found only that a monetary basis of qualification, such as a filing fee, without an alternative, was improper:

> [T]o require of an indigent independent candidate in a general election that he come forward with both a nominating petition *and* a qualifying fee, with no other means of getting on the ballot, is a violation of equal protection.

*Id.* at 1041. *See also* Thomas v. Mims, 317 F.Supp. 179 (S.D.Ala.1970), where the Court spoke approvingly of alternative methods of ballot regulation to circumvent mechanical and financial problems and to avoid irresponsible political maneuverings:

> The door should not be closed on reasonable, non-arbitrary, or non-exorbitant qualifying fees as an aid to "screening out fictitious and trumped-up candidates" provided such tests that a "candidate can get his name on the ballot in some other fashion, either by nominating petition, primary election, or pauper's affidavit," are met.

*Id.* at 182. It is evident that effective ballot controls may be imposed without requiring a filing fee, and, in fact, a number of states employ alternative methods presently. *See*, for instance, the discussions in Carter v. Dies, 321 F.Supp. 1358, 1361 n. 7 (N.D.Tex.1970) and GSWP v. Fortson, 315 F.Supp. 1035, 1040 n. 1 (N.D.Ga.1970). A minimal requirement has been shown to be "perfectly consistent with the effective functioning of the electoral process", Williams v. Rhodes, 393 U.S. 23, 47, 89 S.Ct. 5, 19, 21 L.Ed.2d 24 (1968). For instance, in providing for a nominating petition as a means of access to the

presidental ballot, forty-two states require third parties to obtain the signatures of one percent or less of the electorate. *Id.* at 33 n. 9, 89 S.Ct. 5. Of the remaining eight states, seven required five percent or less. *Id.* at 47 n. 10, 89 S.Ct. 5. *See* the listing of states requiring only a minimal flat number of signatures, GSWP v. Fortson, 315 F.Supp. 1035, 1040 n. 1 (N.D.Ga. 1970).

There has been disagreement among the Courts in assessing the interests of the states in regulating elections. In Wetherington v. Adams, 309 F.Supp. 318 (N.D.Fla.1970), the Court, applying the less stringent "rational basis" test, held that there was a reasonable state interest to be protected by the imposition of a filing fee for candidacy to state political offices:

> In order to insure serious political candidates it is reasonable to require a reasonable filing fee. A serious candidate for public office has traditionally attracted money for his candidacy. The inability to pay a reasonable filing fee might indicate lack of potential support for a person's candidacy.

> \* \* \* \* \* · \*

> There may be some disadvantages to a write-in candidacy but it does provide a means whereby any citizen, regardless of his political support or his individual wealth, can present himself to the voters for their consideration.

309 F.Supp. at 321 and 322. Subsequent to *Wetherington,* another federal court in Florida upheld a filing fee for United States congressional candidates equal to five percent of the annual salary for that office. The Court's reasoning closely paralleled that in *Wetherington,* the opinion noting that the required filing fee was not really an additional qualification to office holding, since "[a] filing fee \* \* \* is not personal to the candidate but may be paid by anyone in his behalf." Fowler v. Adams, 315 F.Supp. 592, 594 (M.D.Fla.1970). The fee was merely, the Court said, "a regulatory measure designed to insure fair and orderly elections." *Id.*

It is of interest to note that most of the post-*Wetherington* cases which have treated that decision have sought to distinguish rather than disagree on the rationale that *Wetherington* applied to primary or nominating elections, and did not impose a fee "on the right to run for the office itself," Thomas v. Mims, 317 F.Supp. 179 (S.D.Ala.1970). However, the *Carter* decision, striking down the filing fee requirement as applied to the Texas *primary* election process, also distinguished *Wetherington,* but on the basis of the relative rights of voters and candidates.

It would appear that a state's interest in a primary election would parallel to a considerable degree a state's interest in a general election and that certain considerations would be alike. These would include (1) a desire that a qualified candidate be chosen; (2) that the candidate or person elected be the choice of a majority of the electorate; (3) that the ballot be reasonably restricted in size so that a true majority choice can be made without an excessive number of "run offs"; and (4) that there be some method of elimination of spurious candidates. *See* Spillers v. Slaughter, 325 F. Supp. 550, 553 (M.D.Fla.1971), judgment vacated *sub nom.,* Pope v. Haimowitz, 404 U.S. 806, 92 S.Ct. 55, 30 L.Ed.2d 37 (1971). *See also* Carter v. Dies, 321 F. Supp. 1358 (N.D.Tex.1970) (concurring opinion of Judge Thornberry).

Whether the primary vs. general election distinction noted, *supra,* is actually controlling, or whether the cases simply manifest a difference in underlying rationale is not entirely clear. Nevertheless, it is believed that the appropriate view, which this Court adopts herein, is that voiced in *Jenness*:

> [T]o prohibit candidates from getting their names on the ballot solely because they cannot post a certain

amount of money is illegal and unconstitutional. We make *no such holding* with respect to the exaction of a qualifying fee in future elections where the candidate can get his name on the ballot in some other fashion, either by nominating petition, primary election, or pauper's affidavit. Whether the City in the future wishes to continue to collect reasonable qualifying fees in conjunction with such alternatives is a matter for the City to decide. (emphasis supplied).

306 F.Supp. at 929.

Plaintiffs here allege an inability to pay the assessed filing fee. The city does not stipulate to that fact, and thus touches upon a potentially important constitutional issue as to whether a filing fee may be imposed, without alternative, for all candidates except those who qualify as paupers. *Cf.* Thomas v. Mims, 317 F.Supp. 179, 182 (S.D.Ala. 1970). That question should not be prematurely considered here, for if the city chooses to allow the alternative of a nominating petition for any candidate in lieu of the payment of fees, the issue of "ability to pay" versus "refusal to pay" does not arise.

### IV.

It is with some reluctance that the Court approaches election eve with a decision of such immediate effect. But a weighing of the risks and potential injury which could accrue to either party justifies the application of this order to the November, 1971 election. *Cf.* Jenness v. Little, 306 F.Supp. 925, 929 (N.D.Ga.1969). Therefore, and in accordance with the limitations specified in III, *supra*, it is ordered that plaintiffs' names shall be entered on the ballot. Defendants are hereby enjoined from the imposition of a qualifying fee or a real property ownership requirement against these plaintiffs, and are further enjoined from the imposition of these requirements in a manner inconsistent with this opinion in the future.