**Gus HALL et al., Plaintiffs,**

v.

**Richard H. AUSTIN et al., Defendants.**

**Civ. A. No. 80–72275.**

United States District Court,
E. D. Michigan, S. D.

Aug. 19, 1980.

George B. Washington, Detroit, Mich., for plaintiffs.

Daniel M. Share, Detroit, Mich., for amicus curiae.

Haywood W. Julian, Asst. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

Plaintiff Gus Hall is a candidate for the office of President of the United States. Plaintiff Angela Davis is a candidate for Vice President. Plaintiffs Vanderdoes and Jacques wish to be electors pledged to Hall and Davis. Plaintiffs Sykes and Smith desire to vote for Hall and Davis. The defendants include the Secretary of State and members of the Board of Canvassers of the State of Michigan, who are charged with supervising elections and certifying candidates to appear on the ballot in this state.[1]

The plaintiffs filed this action on June 24, 1980 seeking an injunction to compel the defendants and their agents to place Hall and Davis on the November 4, 1980 Michi-

---

1. The Court acknowledges the assistance of the American Civil Liberties Union who appeared as amicus curiae.

gan ballot as candidates for President and Vice President respectively. The plaintiffs contend that the defendants' admitted refusal to put Hall and Davis on the ballot is a violation of plaintiffs' constitutional rights to freedom of political expression, due process, and equal protection. U.S. Const. Amends. I, XIV. Presently before the Court is plaintiffs' Motion for Summary Judgment.

The pertinent facts are undisputed.[2] First,

"The defendants admit that there is presently no statutory method by which independent candidates for the office of President and Vice-President of the United States may gain access to the Michigan general election ballot." Answer to Amended Complaint, ¶ 1. *See also* ¶ 12.

Although the Michigan election laws provide no opportunity for independent candidates to appear on the ballot, the laws do provide means of ballot access for candidates of both "new" and established political parties. M.C.L.A. §§ 168.560a, 168.560b, 168.685. For example, the statutory procedures for candidates of minority parties require that the party certify to the Secretary of State, three months before the primary, the names of its candidates, and petitions bearing a designated number of voters' signatures; the candidates are then included on the primary ballot; then if the party receives a certain percentage of the primary vote, its candidates will appear on the general election ballot.

Gus Hall and Angela Davis have qualified to appear on the general election ballot in several states. In Michigan they have not qualified as candidates of an established political party; nor have they attempted to follow the statutory qualifying procedures for new (minority) political parties. Choosing to run as independent candidates, and

knowing of no statutorily designated manner to qualify for ballot inclusion as independents, Hall and Davis sent the defendant Secretary of State on May 5, 1980 a "Declaration of Candidacies" and an affidavit describing their campaign. Amended Complaint, Exhibits A and B.

The Secretary of State replied on May 29, 1980. Amended Complaint, Exhibit C. He informed Hall and Davis that there was no legal authority for placing them on the ballot on the basis of their May 5th submissions; that, consequently, they would not appear on the election ballot; but that they could still be write-in candidates if they wished.

## A. CONSTITUTIONAL RIGHTS OF BALLOT ACCESS

■ At the outset the Court should place this controversy in its proper perspective by reviewing some accepted principles of constitutional law. There can no longer be any doubt that state laws which preclude independent candidates from appearing on the ballot are unconstitutional; it makes no difference whether the state expressly prohibits independent candidates from appearing on the ballot or simply fails to provide them with any mechanism of access. *McCarthy v. Briscoe*, 429 U.S. 1317, 97 S.Ct. 10, 50 L.Ed.2d 49 (1976, Powell, Circuit Justice); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *McCarthy v. Austin*, 423 F.Supp. 990 (W.D.Mich.1976); *MacBride v. Exon*, 558 F.2d 443 (8th Cir. 1977); *McCarthy v. Exon*, 424 F.Supp. 1143 (D.C.Neb.1976); *McCarthy v. Tribbitt*, 421 F.Supp. 1193 (D.C.Del.1976). Indeed, the defendants do not contest this thesis.[3]

In *McCarthy v. Briscoe, supra*, Justice Powell wrote:

2. The defendants filed no affidavits or other submissions of fact in opposition to plaintiffs' Motion. At oral argument the defendants acknowledged that summary disposition would be appropriate in this case because there is no real controversy about the facts.

3. Rather, the defendants' position is that the State of Michigan *does* offer independent can-

didates a means (albeit non-statutory) to get on the ballot. Furthermore, defendants argue, even if the Court finds that independent candidates have been denied any means of ballot access, it would not be appropriate to place Hall and Davis on the ballot as a remedy. These arguments will be addressed, *infra*.

"The new Texas law precluding independent candidates for President from gaining access to the general election ballot as independents raises no novel issue of constitutional law. . . . [The] Court [has] flatly rejected the notion that an independent could be forced to seek ballot position by joining or organizing a political party: . . ."

429 U.S. at 1320, 97 S.Ct. at 12.

And in *Storer v. Brown, supra,* the Supreme Court observed:

[i]t may be that the 1% registration requirement is a valid condition to extending ballot position to a new political party. But the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other. A new party organization contemplates a state-wide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office. From the standpoint of a potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his own independent status, even though· his possible interest in the new party centers around a particular candidate for a particular office. For the candidate himself, it would mean undertaking the serious responsibilities of qualified party status under California law, such as the conduct of a primary, holding party conventions, and the promulgation of party platforms. But more fundamentally, the candidate, who is by definition an independent and desires to remain one, must now consider himself a party man, surrendering his independent status. Must he necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not."

415 U.S. at 745–746, 94 S.Ct. at 1286. (Citation omitted.)

In *McCarthy v. Austin, supra,* a statutory three judge federal court held that Michigan's former election laws were unconstitutional in that they absolutely excluded independent candidates from securing a position on the ballot. (That Court did not rule directly on the constitutionality of Michigan's new election law, 1976 P.A. 94, which is in question here. 423 F.2d at 994, n. 3.) The *Austin* decision emphasized the significant First Amendment rights which are at stake in these ballot access cases:

"We begin with the premise that the right to vote is paramount—'a fundamental political right because it is preservative of all rights.' *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court declared:

'The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.' 377 U.S. at 555, 84 S.Ct. at 1378. Correlative to the right of individual franchise is the right to cast one's vote for the candidate of one's choice: 'A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." 2 Elliot's Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself.' *Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491 (1969).

The full and effective utilization of the individual franchise may entail some form of group association. In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Supreme Court termed 'the right of individuals to associate for the advancement of political beliefs' one of 'our most precious freedoms.' 393 U.S. at 30, 89 S.Ct. 5. . . . in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Court declared that certain restraints on 'independent associations ·and candidate campaign organizations' are ' "simultaneously an interference with the freedom of [their] adherents" *Sweezy v. New Hampshire,* 354

U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion).' 424 U.S. at 22, 96 S.Ct. at 636."

423 F.Supp. at 995–996.

Thus unwarranted restrictions on ballot access simultaneously impinge on both the candidate's and his supporters' rights of political activity.

"The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters."

*Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).

Finally, restrictions on ballot access implicate the *public's* right to hear all views in a full and free exchange of political ideas.

"Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms."

*Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968).

The right to the benefits flowing from unfettered discussion of political ideas is a right of the public. The participation of independent, dissident, or minority candidates strengthens the democratic process and contributes to free and open political debate.[4] Exclusion of such candidates is thus a form of censorship which affects the rights of even those members of the public who do not support and would not vote for the excluded candidates.

In sum, state laws foreclosing ballot access to independent candidates infringe upon the constellation of rights which are among the most precious and vulnerable in our democracy.

## B. AVAILABILITY OF OTHER ROUTES OF BALLOT ACCESS FOR INDEPENDENT CANDIDATES

Defendants argue that neither they nor the Michigan legislature excluded Hall and Davis from the November election ballot; that a non-statutory avenue of access was open to Hall and Davis. The defendants suggest that Hall and Davis could have obtained a position on the ballot by following the procedures required of new political party candidates, i. e., by gathering a sufficient number of petition signatures and, following that, a sufficient number of primary votes. According to the defendants, this method of access was extended to independent candidates by the three judge federal court in *McCarthy v. Austin,* 423 F.Supp. 990 (W.D.Mich.1976). Since Hall and Davis were given a means of ballot access "by judicial mandate, irrespective of statutory deficiency", defendants argue, there was no abridgement of plaintiffs' rights. Defendants' Brief, page 5.

If by this argument defendants seek to prove that the Michigan election laws are constitutional because they do now give access to independents, then defendants have seriously misunderstood *McCarthy v. Austin.* In order to remedy the failure of Michigan election laws to offer independents the opportunity to get on the ballot, the *Austin* Court decreed:

"The election laws and procedures of the State of Michigan, Public Act 116 of

---

4. "So long as the two-party system remains entrenched, minor parties and independent candidates generally have only a slight chance of electoral success. Nonetheless, they perform important functions in the political process. Frequently they raise issues and develop policies long before established parties are prepared to act, and their presence on the general election ballot and participation in election campaigns permits voters to demonstrate support for new or unorthodox ideas. Major party nominees may respond to popular support for other candidates by reformulating their policies and programs. Thus, despite a general lack of electoral success, minor parties and independent candidates may eventually see substantial portions of their programs implemented.

Minor parties and independent candidacies may also serve a legitimizing function, by providing disaffected voters with an outlet for their frustration with established parties. Without this alternative, dissatisfied voters who find themselves repeatedly confronted with unattractive policies and candidates may come to doubt the legitimacy of the entire electoral process. It is therefore plain that the importance of independent and minor party candidates transcends their ability to capture electoral office."
Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1123 (1975).

1954, M.S.A. Chapter 58a, are constitutionally deficient . . . and therefore shall be implemented to permit independent candidates not affiliated with any political party a position on the official State ballot on terms and conditions equal to those of partisan candidates." 423 F.Supp. at 1000.

The Court did not purport to interpret the Michigan election laws so as to imbue them with Constitutional substance; nor did it discover an implied means of ballot access. The Court simply created a remedy for the *deficiency* in Michigan law. Moreover, the remedy in the *Austin* case did not and could not become a part of Michigan law. Federal courts cannot amend state statutes. So *McCarthy v. Austin* did not by virtue of its remedial order restore the constitutionality of the Michigan election laws; it merely provided the method appropriate to that case to cure the defect of unconstitutionality.

On the other hand, defendants' argument based on the *McCarthy v. Austin* decision may be interpreted in a different light. Defendants may acknowledge that no method of ballot access is provided by Michigan law. (Thus the argument would tacitly concede that the Michigan election laws are unconstitutional.) Defendants' position may be that nevertheless, Hall and Davis did in fact have a method of ballot access in Michigan as a result of the *Austin* Court decision.

"The defendants and their agents would have accepted any petition filings by the plaintiffs had they chosen to file petitions based on the federal court's order in *McCarthy [v. Austin]*."
Defendant's Brief, page 9.

As a matter of fact the existence of this method of access is dubious, in light of the legislature's refusal to authorize such an approach. The defendants have not submitted any supporting affidavits or other materials which might genuinely put their factual assertion in issue. There has been no suggestion that any other independent candidates have been allowed on the primary ballot upon gathering sufficient signatures; in fact there is no affidavit stating that the defendants have accepted and processed any petitions from independent candidates. Nor does the record contain any indication, by way of state regulation or department policy pronouncement, that such a method is open to independents in Michigan. On the contrary, the most telling evidence before the Court is the fact that the May 29, 1980 letter from defendants to Hall and Davis makes absolutely no mention of a petition-and-primary route for independents. The only support in the record for defendants' allegation is the *Austin* opinion itself. Although it is true that the *Austin* Court ordered defendants to grant independents access on the same terms as party candidates, the order was expressly limited to Michigan's former election laws, and, by implication, to the 1976 election. In sum, it appears that this means of access for independent candidates has only a mythical existence.

Even if the defendants have properly raised an issue of fact regarding the availability of a mechanism for independents to obtain ballot access, resolution of this factual issue is unnecessary because, as a matter of law, the alleged method of access is constitutionally inadequate.

■ First, a never-exercised method of ballot access which is neither contained in state law nor publicly announced by the state offends due process.[5] The state cannot maintain a secret, undisclosed avenue of ballot access and argue that its citizens should be charged with notice that such a procedure exists on the basis of a four year

5. Some ballot access restrictions have been held to deprive persons of liberty without due process of law. U.S.Const. Amend. XIV. In *Hudler v. Austin*, 419 F.Supp. 1002 (E.D.Mich. 1976), a three judge court upheld the facial constitutionality of Michigan's present election laws regarding new political party candidates.

But the court ruled that the new laws, which went into effect in April of 1976, were unconstitutional as applied to the November, 1976 election because they deprived the partisan candidates of adequate time and notice for compliance. Id. at 1014.

old court decision which supposedly opened up this avenue.

▆▆▆ Furthermore, the state's unannounced and unemployed practice of permitting independents access on the same terms as party candidates is an unconstitutionally severe restriction of plaintiffs' First Amendment rights. "The Constitution requires that access to the electorate be real, not 'merely theoretical'". *American Party of Texas v. White*, 415 U.S. 767, 783, 94 S.Ct. 1296, 1307, 39 L.Ed.2d 744 (1974). Thus

> "the State must provide a *feasible* opportunity for new political organizations and their candidates to appear on the ballot." *Storer v. Brown, supra*, 415 U.S. at 746, 94 S.Ct. at 1287 (emphasis supplied).

The test is:

> "could a reasonably diligent independent candidate be expected to satisfy the significant requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Id.* at 742, 94 S.Ct. at 1285.

The answer is clear: a concealed, unknown means of ballot access makes it virtually impossible for independents to obtain a position on the ballot.[6]

## C. THE APPROPRIATE REMEDY

### 1. *The McCarthy v. Austin Approach*

The defendants argue that *McCarthy v. Austin, supra*, establishes the appropriate remedy for an unconstitutional denial of

ballot access to independents—the independent candidate should only be placed on the ballot if he fulfills the terms and conditions statutorily required of party candidates. *Austin, supra* at 1000.

The conditional remedy approved in *McCarthy v. Austin* is not binding in the case at bar. In the first place, *McCarthy v. Austin* is distinguishable on its facts. There the independent candidate had followed the petition procedures for party candidates and had simply asked the court to test his candidacy by the same standards used for party candidates.[7] *Austin, supra* at 995. So the court framed a remedy geared to the particular circumstances of a plaintiff who happened to accept and fulfill the requirements for party candidates. Any language suggesting that this same remedy would necessarily apply to all other independent candidates must be considered *obiter dicta*.

Second, *McCarthy v. Austin*'s proposed remedy has been superseded by the more recent Supreme Court case of *McCarthy v. Briscoe*.[8] In *Briscoe* the Texas election laws provided no method for independent presidential aspirants to obtain ballot access, although the statutes did provide signature-gathering access procedures for presidential *party* candidates and for *nonpresidential* independent candidates. In Texas Senator Eugene J. McCarthy had missed the filing deadline and thus was unwilling to be bound by the petition procedures. The Supreme Court did not hold

---

6. In the same vein, the possibility of garnering votes as a write-in candidate is not a constitutionally meaningful means of ballot access. *Williams v. Rhodes, supra* 393 U.S. at 37, 89 S.Ct. at 13–14; *Lubin v. Panish, supra* 415 U.S. at 719, n. 5, 94 S.Ct. at 1321; *McCarthy v. Briscoe, supra* 429 U.S. at 1321, 97 S.Ct. at 12–13. Like the undisclosed *McCarthy v. Austin* means of access, the write-in route is illusory.

7. *McCarthy v. Austin* was accordingly decided on narrow equal protection grounds. *Id.* at 999. Unsurprisingly the remedy stated that independent candidates should receive treatment equal to that of party candidates.

Even if this Court applied the *Austin* precept that independents be given ballot access on equal terms with party candidates, the Court

would conclude that Hall and Davis may appear on the ballot despite their failure to satisfy requirements for party candidates. Those requirements impose an unequal and discriminatory burden on independent candidates. Party candidates are informed in advance of the amount of signatures which are required of them and on what date they are due. Independent candidates are severely handicapped because they have not been told in advance of the prerequisites they must meet in order to qualify.

8. *Briscoe* was drafted by Justice Powell in his capacity as Circuit Justice. However, Justice Powell was authorized by a (5–4) majority of the Court to grant the relief he did. *Id.* 429 U.S. at 1324, 97 S.Ct. at 14.

McCarthy to those procedures, but placed him on the ballot despite his failure to satisfy the statutory requirements for party candidates. This Supreme Court precedent controls the case at bar.

### 2. The Storer v. Brown Approach

In the alternative defendants argue that Hall and Davis may only be placed on the ballot if they satisfy the criteria of *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). The defendants rely on the following passage from *Storer*:

> "we perceive no sufficient state interest in conditioning ballot position for an independent candidate on his forming a new political party as long as the State is free to assure itself that the candidate is a *serious contender, truly independent,* and *with a satisfactory level of community support.*"

*Id.* at 746, 94 S.Ct. at 1287 (emphasis supplied).

The quoted passage means only that the state has the power, the option, to establish procedures which reasonably assure that independent candidates are serious and independent and possess satisfactory support.[9] Neither *Storer* nor any other case has held that, in the absence of any state regulations or requirements, the Constitution by itself imposes any qualifications on ballot access other than those of age, residence, and citizenship. U.S.Const., Art. II, Sec. 1, Cl. 5; *McCarthy v. Tribbitt*, 421 F.Supp. 1193, 1197 (D.C.Del.1976). Nor did *Storer* suggest that the courts should devise qualifying procedures of ballot access where the state legislature has failed to exercise its authority in that regard.

Nevertheless, the Court cannot agree with plaintiffs' suggestion that every independent candidate has an unqualified right to be placed on the ballot automatically once a court finds that the state laws unconstitutionally excluded independent candidates.[10] Because the plaintiffs seek equitable relief, the Court must try to resolve competing interests and consider whether it would be appropriate to grant injunctive relief. *McCarthy v. Briscoe, supra; MacBride v. Askew*, 541 F.2d 465, 468 (5th Cir. 1976). *Compare, Williams v. Rhodes, supra* (employing traditional equitable considerations to decide whether equitable relief was warranted, after finding violations of plaintiffs' constitutional rights of ballot access).

Justice Powell's opinion in *Briscoe* provides the most authoritative guidance in this situation. After finding Texas' ballot law unconstitutional, Justice Powell did conduct a *de minimis* review of the candidate's credentials before placing him on the ballot:

> "[T]he Texas Legislature provided no means by which an independent Presidential candidate might demonstrate substantial voter support. Given this legislative default, the courts were free to determine on the existing record whether it would be appropriate to order Senator McCarthy's name added to the general election ballot as a remedy for what the District Court properly characterized as an 'incomprehensible policy' violative of constitutional rights. . . .

> In determining whether to order a candidate's name added to the ballot as a remedy for a State's denial of access, a

---

**9.** The state's power to regulate elections is derived from Art. II, Sec. 1, Cl. 2 of the United States Constitution. This power is limited, of course, by the First and Fourteenth Amendments to the Constitution.

**10.** The plaintiffs take their cue from *McCarthy v. Tribbitt, supra:*
> "Simply stated, every independent candidate has the right to have his name placed on a ballot, subject to the state's authority to restrict access to those who are independent, serious and have *community support.* . . . Since the Federal Constitution establishes no qualifications for presidential candidates,

other than age, citizenship, and residence, and since the Delaware restrictions are unconstitutional as applied to independent candidates, the plaintiff candidates have a right to be placed on the ballot. . . . 'this is a federal court and not the Delaware General Assembly . . . the defendants cannot now successfully seek to impose judicially a requirement that the legislature has declined to impose. This Court will not presume to encroach upon the legislative discretion delegated by Article I Sec. 4 . . .' "
421 F.Supp. at 1197-1198.

court should be sensitive to the State's legitimate interest in preventing 'laundry list' ballots that 'discourage voter participation and confuse and frustrate those who do participate.' *Lubin v. Panish, supra* 415 U.S. at 715, 94 S.Ct. at 1319. But where a State forecloses independent candidacy in Presidential elections by affording no means for a candidate to demonstrate community support, as Texas has done here, a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support."

429 U.S. at 1322–1323, 97 S.Ct. at 13.

■ It is noteworthy that Justice Powell's sole inquiry concerned the degree of support for the plaintiff's candidacy. Justice Powell concluded that the plaintiff's support was adequate on the basis of a few observations:

"It is not seriously contested that Senator McCarthy is a nationally known figure; that he served two terms in the United States Senate and five in the United States House of Representatives; that he was an active candidate for the Democratic nomination for President in 1968, winning a substantial percentage of the votes cast in the primary elections; and that he has succeeded this year in qualifying for position on the general election ballot in many States. The defendants have made no showing that support for Senator McCarthy is less substantial in Texas than elsewhere."

It is also noteworthy that *national* support is sufficient, if there is no special reason to doubt the candidate's local support.

■ Reviewing the candidacies of Hall and Davis in light of the *Briscoe* decision, the Court easily concludes that "there is reason to assume" that Hall and Davis have "the requisite degree of community support." [11] This is not to say that Hall and Davis have support approaching that of Senator McCarthy. Hall and Davis have never held public office; nor have they approached the substantial and significant popular vote total of Senator McCarthy's presidential candidacy. But Hall and Davis are nationally-known and world-renowned public figures. Hall has twice before been a presidential aspirant on the ballot in many states. Particularly persuasive is the fact that Hall and Davis have already succeeded in qualifying on the ballot in some states for the 1980 election. The defendants have made no showing that there is less support for Hall and Davis' candidacy in Michigan than there is in Kansas, Kentucky, Maine, New Jersey, or Utah (all states where Hall and Davis have qualified). In fact, Hall was on the presidential ballot in Michigan in 1972.[12]

■ The defendants question whether Hall and Davis are genuinely independent, since they are leading members of a political organization known as the Communist Party and they are running under that party's banner in some other states. The short answer to this is that the Supreme Court has implicitly ruled that Gus Hall may be an independent candidate despite his signif-

**11.** The proper quantum of support is variously described as "substantial support" (*Briscoe*), "a significant modicum of support" (*Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1970)), and "a satisfactory level of support" (*Storer*).

**12.** Defendants assert that although Hall conducted presidential campaigns in the past, he never received more than a few thousand votes in any given state. But electability is not an appropriate prerequisite for ballot access. The real question is whether there is enough support for placing a given candidate on the ballot, not whether there is enough support for electing the candidate. A large segment of the

public may be determined never to vote for Hall and Davis yet may wish to see them on the ballot and support their efforts to get on the ballot. Another segment of the public may be attracted to Hall and Davis, may find their viewpoint appealing, and may even support their candidacy in various ways. Yet when the members of this sympathetic constituency finally enter the voting booth, they may decide to vote for candidates with a greater likelihood of success.

Considering Hall and Davis' support in this sense—putting aside the question of their vote-getting ability—the Court is bound to conclude that they have substantial community support.

icant affiliation with the Communist Party. In *Storer v. Brown, supra,* the Supreme Court reversed and remanded a lower court's ruling that Hall had no right of access as an independent in California. In so doing, the Supreme Court recognized that

> "Hall and Tyner claimed the right to ballot position as independent candidates for President and Vice President of the United States. They were members of the Communist Party but that party had not qualified for ballot position in California."

415 U.S. at 727–728, 94 S.Ct. at 1278. In the absence of near-fraud the courts treat a candidate as independent if he claims to be independent. *Compare, MacBride v. Askew,* 541 F.2d 465 (5th Cir. 1976) (a candidate who recently attempted to get on the ballot as the nominated candidate of a registered political party, which had qualified as a minor party under Florida law, held: not independent).

Since this is a suit for equitable relief, the Court must take account of the public interest, and consider the hardships imposed if relief is granted. *McCarthy v. Noel,* 420 F.Supp. 799, 804 (D.C.R.I.1976); *11 Wright and Miller, Federal Practice and Procedure, § 2942.* So the Court must give due consideration to the public interest in preserving the integrity of the ballot:

> "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding voter confusion, deception and even frustration of the democratic process at the general election."

*Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976 (1971).

> "[The] State has a legitimate interest in regulating the number of candidates on the ballot. . . . In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections . . . we are bound to respect the legitimate objective of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies." (Citations omitted.)

*Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1971).

The Court is certain that placing Hall and Davis on the Michigan ballot will not impair these legitimate public interests. The Michigan ballot lists only five presidential candidates. Hall and Davis can hardly be compared to the defendants' examples of frivolous candidates who have attempted to qualify as independent candidates. They are earnest and experienced politicians who are recognized, interviewed and written about by the news media and invited to speak and participate by many organizations. They espouse a serious political program and address important issues pertaining to race, economics, and government. In short, there is no indication that the addition of Hall and Davis will in any way impair the ability of the electorate to make rational decisions at the polling booth. On the contrary, their participation as candidates may well assure that the electorate is better informed as to crucial issues and alternative positions which the voter may accept, reject or utilize for comparison. After all, this is the meaning and strength of democracy and the formula for its perpetuation and growth.

Finally, the Court must take note of the Michigan legislature's continuing failure to correct the unconstitutional aspects of the Michigan election laws. In 1976, in *McCarthy v. Briscoe,* Justice Powell declared that the Texas legislature's failure, two years after *Storer,* to provide any access for independent candidates, could be "properly characterized" as an "intransigent and discriminatory position" and as an "incomprehensible policy". Four years have elapsed since Justice Powell wrote. It has also been

four years since the defendants and the Michigan legislature were specifically advised in *McCarthy v. Austin* that Michigan's election laws bore the same constitutional infirmity. It is necessary to emphasize again that the rights at stake here—the rights of popular sovereignty—are crucial to our democracy.

Plaintiffs' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.